```
1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3   UNITED STATES OF AMERICA,    )    Case No. 3:15-CR-00496-L
                                 )
4           Plaintiff,           )
                                 )    Dallas, Texas
5   v.                           )    July 20, 2017
                                 )    10:00 a.m.
6   USPLABS, LLC, et al.,        )
                                 )    MOTIONS
7           Defendants.          )
                                 )
8   _____)

9                      TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
                 UNITED STATES MAGISTRATE JUDGE.
11
    APPEARANCES:
12
    For the Government:          Patrick Raymond Runkle
13                               David O'Donald Sullivan
                                 U.S. DEPARTMENT OF JUSTICE
14                               CONSUMER PROTECTION BRANCH
                                 P.O. Box 386
15                               Washington, DC 20044-0386
                                 (202) 616-0219
16
    For USPLabs, LLC,            Michael John Uhl
17  Defendant:                   FITZPATRICK HAGOOD SMITH & UHL
                                 2515 McKinney Avenue, Suite 1400
18                               Dallas, TX  75201
                                 (214) 237-0900
19
    For USPLabs, LLC,            Christopher Niewoehner
20  Defendant:                   STEPTOE & JOHNSON, LLP
                                 115 S. LaSalle Street, Suite 3100
21                               Chicago, IL  60603
                                 (312) 577-1264
22
    For USPLabs, LLC,            Patrick Linehan
23  Defendant:                   STEPTOE & JOHNSON, LLP
                                 1330 Connecticut Avenue NW
24                               Washington, DC  20036
                                 (202) 429-8154
25
```

```
 1   APPEARANCES, cont'd.:

 2   For Jonathan Doyle,          Richard B. Roper, III
     Defendant:                   THOMPSON & KNIGHT, LLP
 3                                1722 Routh Street, Suite 1500
                                  Dallas, TX  75201
 4                                (214) 969-1700

 5   For Matthew Hebert,          S. Cass Weiland
     Defendant:                   SQUIRE PATTON BOGGS (US) LLP
 6                                2000 McKinney Avenue, Suite 1700
                                  Dallas, TX  75201
 7                                (214) 758-1504

 8   For Jacobo Geissler,         Michael P. Gibson
     Defendant:                   BURLESON PATE & GIBSON, LLP
 9                                900 Jackson Street, Suite 330
                                  Dallas, TX  75202
10                                (214) 871-4900

11   Court Recorder:              Jane W. Amerson
                                  UNITED STATES DISTRICT COURT
12                                1100 Commerce Street, Room 1611
                                  Dallas, TX  75242-1003
13                                (214) 753-2360

14   Transcription Service:       Kathy Rehling
                                  311 Paradise Cove
15                                Shady Shores, TX  76208
                                  (972) 786-3063
16

17

18

19

20

21

22

23

24
                 Proceedings recorded by electronic sound recording;
25                  transcript produced by transcription service.
```

1          DALLAS, TEXAS - JULY 20, 2017 - 10:02 A.M.

2          THE COURT:  This is Case No. 3:15-CR-496-L, United

3   States of America vs. USPLabs and others.  And this hearing is

4   pursuant to the referral of District Judge Lindsay to me of

5   Defendant Herbert's *Brady* motion, Document #130, and

6   Government's cross-motion, Document 143, and Defendant's motion

7   for protective order, Document 210, and Defendant's motion to

8   quash the grand jury subpoena to USPLabs, Document 176.

9       Having reviewed the filings, my plan is to take the motions

10  up in this order.  One, first, Defendant Herbert's *Brady*

11  motion, which seems to be raising discrete issues.  Secondly,

12  the cross-motion filed and included in the response to that and

13  the Government's cross-motion and the motion for protective

14  order at the same time because they, to me, appear to be

15  related.  And the motion to quash the grand jury subpoena to

16  USPLabs last, to double back to that.

17      And with the exception of the Defendant Herbert's *Brady*

18  motion, which I am calling it for short, but with the exception

19  of that, it's my intention that any of the Defense Counsel who

20  want to argue regarding the other motions may do so.  I only

21  ask that you not repeat something that co-defendant's counsel

22  has already stated.

23      And so, with that, if we could start, Mr. Weiland, with the

24  Defendant's motion for disclosure of specific impeachment and

25  exculpatory information motion.

1          MR. WEILAND:  Thank you, Your Honor.  And I certainly

2    applaud the notion that the cross-motion that was filed in

3    response to my motion, my *Brady* motion, is indeed very related

4    to the motion for protective order filed by the company and

5    others.  So I understand you're going to consider those two

6    separately so I'm not going to talk about the cross-motion, if

7    that's all right.

8          THE COURT:  All right.

9          MR. WEILAND:  Your Honor, I can be brief.  I know

10   you've read the papers.  My client, he pronounces his name

11   Hebert.

12         THE COURT:  He--?

13         MR. WEILAND:  Hebert.

14         THE COURT:  Hebert?

15         MR. WEILAND:  Hebert.  Matthew Hebert.

16         THE COURT:  Okay.

17         MR. WEILAND:  And we filed this motion separately for

18   several reasons.  But just so the Court is aware, Mr. Hebert

19   was only a 10 percent owner or is only a 10 percent owner of

20   USPLabs.  Essentially, Mr. Hebert was the graphics guy who

21   handled the labeling of the various USP products.  And so,

22   because of his status in the company and his relative

23   inactivity in terms of operations of the company, particularly

24   the technical aspects of the products, we believe that there

25   could be an enormous amount of exculpatory material in the

1    hands of the Government.  And we believe, because of the

2    complexity of this case, that they should point out what they

3    already know to be exculpatory and not wait until the eve of

4    trial.

5        The Government's position, Your Honor, seems to be that we

6    don't know of any exculpatory material, and if we do, we don't

7    have to give it to you until the trial.  That's in

8    contravention of Judge Lindsay's opinion in the case, where he

9    says as soon as it's -- the Government is aware of it, it

10   should be produced.  Now, --

11           THE COURT:  Well, certainly in time enough for you to

12   make use of it, I would think.

13           MR. WEILAND:  For sure.

14           THE COURT:  Uh-huh.

15           MR. WEILAND:  And since we've already had four trial

16   settings, the indictment was in November 2015, now is the time.

17   The Government -- we have kind of a definitional problem here,

18   I think, Judge, because the Government just says in its papers

19   that we are not aware of any document that is genuinely

20   exculpatory in this case.

21           THE COURT:  That language is troubling, genuinely

22   being operative --

23           MR. WEILAND:  Yes.  Of course, the test is that --

24           THE COURT:  -- for that.

25           MR. WEILAND:  -- they have to produce anything that

1    tends to negate any required element of proof of any of the

2    counts in the case.  And so perhaps they misunderstand *Brady*.

3    And we believe that they've already encountered numerous

4    instances of things that would exculpate Hebert, given his role

5    in the company over time, and we think the Court ought to order

6    them to identify this and produce it.

7            THE COURT:  Well, how can they identify it and produce

8    it if their response is, aside from the troubling one directly

9    to you, but in their response they state that there is none?

10           MR. WEILAND:  Well, --

11           THE COURT:  How can they identify something to you

12   that they say doesn't exist?

13           MR. WEILAND:  Well, that's -- based on their

14   definition of what constitutes *Brady*, that could be the

15   problem.  And it also could be -- the other issue could be

16   that, number one, that statement was made now months ago,

17   months ago, and which we're continuing to get some discovery

18   dribbled in from the Government.

19       You know, maybe the situation has changed, but if it

20   hasn't, it looks to me like their intention is just to produce

21   it on the eve of trial and say, okay, we did find a few things

22   and here they are.

23       Of course, their other position is we don't have to look

24   for it and we've given you, I don't know, a terabyte of

25   information, two terabytes, 500 megabytes, and so just go find

1   it.  Of course, they've frozen so much of my client's assets

2   that trying to wade through this is most difficult, most

3   difficult for Hebert himself, put aside the rest of the

4   Defendants.

5       So, Judge, there's things out there like -- let me give you

6   an example of what we haven't seen.  This doesn't just affect

7   Hebert at all, but there's patient files.  They claim our

8   products have harmed people, so we need to see the patient

9   files of these people who claim harm and find out, because in

10  the related civil cases, investigation has shown that the

11  patients that are the plaintiffs, for example, in some of those

12  civil cases, they have all kinds of preexisting health

13  problems, not to mention they can't prove that they actually

14  took our product.

15      The corollary issue in this case is going to be, did these

16  people actually take our products or did they take a

17  counterfeit product?  So --

18          THE COURT:  So are you suggesting that the Government

19  already has these medical records in its possession and is

20  refusing to turn over to you information about preexisting

21  conditions?

22          MR. WEILAND:  I believe they have access to patient

23  records that they haven't turned over.

24          THE COURT:  Well, I don't know what you mean by access

25  to.

1              MR. WEILAND:  Well, they have -- perhaps their

2     witnesses have them that they plan to use in the trial.  Their

3     experts have them.  I believe they have the patient records, or

4     at least some patient records that we haven't seen yet, within

5     their control.

6              THE COURT:  Okay.  But is this just basically

7     speculation that they have it?  I mean, do you have some basis

8     for believing that they have it?

9              MR. WEILAND:  Well, based on, for example, now we're

10    deeply involved in the clash of experts, as you've seen from

11    the docket sheet.  I mean, there's *Daubert* experts.  There's

12    objections to the experts.  And it looks to us -- it looks to

13    me, and I'll defer to my colleagues on that because they're

14    better versed, but it looks to me like that they've turned over

15    a few files and there's still files out there that perhaps

16    they're saying, we haven't really reviewed those yet, we're not

17    ready to give them to you.  So we'd like an order requiring

18    them to give us what they have.

19              THE COURT:  Well, --

20              MR. WEILAND:  So, --

21              THE COURT:  Okay.  So it sounds more like you're not

22    contesting that they have not -- that they have knowledge of

23    any *Brady/Giglio* materials, only their intention to turn them

24    over at a later date.

25              MR. WEILAND:  That's true.  Yes, Judge.

1            THE COURT:  Okay.

2            MR. WEILAND:  Of course, I'm aware and you're aware of

3    the background of *Brady* violations and *Giglio* violations that

4    have occurred in other cases, including cases in this

5    courthouse, one of which was very recent.  The *Devorn*

6    (phonetic) case is another case in front of Judge O'Connor

7    where this U.S. Attorney's Office had a problem with

8    exculpatory material.  And so we --

9            THE COURT:  Are you talking about the case with the

10   plea agreement, the plea agreement supplement?

11           MR. WEILAND:  Yes.

12           THE COURT:  Okay.

13           MR. WEILAND:  And so we're skeptical.  I've been doing

14   this a long time.  I'm a jaded lawyer about, you know, their

15   protestations of, you know, we have two gigabytes -- I mean,

16   two terabytes of information but we haven't seen a single thing

17   that could possibly exculpate poor Mr. Hebert.

18           THE COURT:  Well, they definitely have the obligation

19   or they end up in front of Fifth Circuit, just like in Judge

20   O'Connor's case.

21           MR. WEILAND:  Right.  Uh-huh.

22           THE COURT:  I mean, they -- and the obligation is

23   ongoing, whether or not you file a motion.  So, I mean, it

24   doesn't prompt -- what I mean is your motion hasn't prompted

25   any obligation or required anything different than what they

 1  already were obligated to do under the law.  And that's why I

 2  keep coming back to the timing of it --

 3          MR. WEILAND:  Right.  Well, --

 4          THE COURT:  -- versus the requirement that they give

 5  it to you, because there's no question that if there is *Brady/*

 6  *Giglio* materials that they have, they are required to give

 7  those to you.

 8          MR. WEILAND:  They are.  And we would say that they

 9  have to define it.  They have to define *Brady* material, for

10  example.

11          THE COURT:  Who has to define it?  Because *Brady*

12  defines *Brady*, *Brady* and its progeny.  Why would they have to

13  --

14          MR. WEILAND:  Well, what I was trying to say, they

15  have to define it in the way the cases define it, not in the

16  way they seem to be defining it.

17          THE COURT:  Well, they have to follow what the cases

18  have defined.

19          MR. WEILAND:  Yeah.  Yeah.  They have to follow the

20  definition, the accepted definition.

21      So what we -- what I think, Judge, would be fair and

22  equitable in the case is for them to produce to us in some time

23  frame that you would consider fair and equitable, but well in

24  advance of trial, whatever *Brady* materials that they have, that

25  they know that they have, and also grand jury testimony,

1   because they have produced some grand jury testimony relating

2   to employees of the company because they were employees of the

3   company.

4           THE COURT:  Well, but they don't have an obligation to

5   generally -- I mean, you know that.

6           MR. WEILAND:  I know --

7           THE COURT:  The rules are specific about when they

8   have to turn over just statements, including grand jury

9   testimony.

10          MR. WEILAND:  Well, I'm not sure they understand,

11  though, Your Honor, what would constitute *Brady*.  If you read

12  the grand jury's testimony of our employees, these people are

13  saying, well, Hebert didn't have much of a role in the company.

14  You know, Hebert wasn't involved in this or that.

15          THE COURT:  Well, how are you reading it if they

16  haven't turned it over to you yet?

17          MR. WEILAND:  They have turned over the testimony of

18  employees of the company.

19          THE COURT:  Uh-huh.

20          MR. WEILAND:  But I believe that there would be

21  similar statements in other grand jury testimony and in witness

22  interviews that would tend to exculpate him, and I'd like to

23  get them before the trial so that we can see for ourselves.

24      Thank you, Judge.

25          THE COURT:  I understand.

1          MR. WEILAND:  Thank you.  My colleague has mentioned

2    one other thing, Judge, is a specific item that we're very

3    interested -- we're very interested in.  As part of their

4    effort to establish that our products or some of our products

5    were dangerous, we know that they've gone out and commissioned

6    additional tests of the products, because it's hotly disputed

7    that they're -- that they ever -- that these products ever

8    harmed anybody.  And we believe that -- we know that we're

9    entitled to any of those tests where they were unable to

10   establish that the products were harmful.  And we know they've

11   been doing the testing, and we would like those --

12         THE COURT:  Do you know that they have had some tests

13   that established that, though, or is that speculation?  Because

14   if they had some tests that established that, then that -- I

15   would tend to agree with you and they would have the obligation

16   already to turn it over.

17         MR. WEILAND:  Right.  We don't know what tests they've

18   conducted.

19         THE COURT:  Okay.

20         MR. WEILAND:  But if there are such where their lab

21   people failed to establish the harmfulness of these products,

22   then we need those and we need them now.

23         MR. RUNKLE:  Thank you, Your Honor.  I'm Patrick

24   Runkle for the Government.  I really appreciate the opportunity

25   to have this hearing today.

1     One preliminary matter that I wanted to discuss was the

2 prospect of grand jury and other sealed material being

3 discussed during the hearing today, and I was just wondering

4 how Your Honor wanted to handle that issue.  There are some

5 spectators in the audience and we've already kind of crossed

6 that bridge a little bit.

7          THE COURT:  Well, I don't think we've talked about the

8 specific content of any -- that hasn't been revealed already.

9 I mean, obviously, the only thing Mr. Weiland discussed was

10 what he already has.

11          MR. RUNKLE:  That's right.  It's been revealed to the

12 Defense --

13          THE COURT:  Right.

14          MR. RUNKLE:  -- pursuant to that rule.  But there are

15 going to be more discussions later on.  I just wanted to flag

16 that issue before I got into my discussion.  I don't --

17          THE COURT:  Okay.  Well, whenever you think it's an

18 issue, we'll take it up at that time.

19          MR. RUNKLE:  Okay.  Thank you, Your Honor.

20     So I want to lift the veil of some of the discussions that

21 Mr. Weiland just had, and I wanted to apologize if the Court

22 was troubled by the "genuinely exculpatory" statement in our

23 filing.  What I think we meant by that was we do have a

24 disagreement with Mr. Weiland about what is exculpatory in this

25 case.  And so we have agreed to fulfill our *Brady* obligations.

1    Obviously, we have to.  We have already been doing so, and we

2    have already turned over about -- I think it's seven terabytes,

3    maybe three terabytes.  I don't know, terabytes are huge, and

4    there's been millions of documents turned over to the Defense.

5        We've invested extraordinary numbers of resources and man-

6    hours into processing, reviewing documents to turn over.  And

7    what I can tell you today is that not a single document has

8    been withheld that we believe is *Brady/Giglio* material.  Not a

9    single document has been withheld.  So the idea that --

10            THE COURT:  But conversely, though, if you're turning

11   over seven terabytes of information, are you saying that you're

12   turning those over as a part of your obligation to provide

13   *Brady/Giglio* materials, in which case, how are they ever going

14   to figure out from that or how is he ever going to figure out

15   from that amount of discovery?

16            MR. RUNKLE:  Right.  Well, I'd point the Court's

17   attention to the *Skilling* (phonetic) case, --

18            THE COURT:  Uh-huh.

19            MR. RUNKLE:  -- which sort of had a similar fact

20   pattern.  What's happened here is that the search warrant

21   materials were turned over in exactly the form in which we got

22   them.  So those images were turned over to the Defense in the

23   same form we got them.  The Government documents -- and I don't

24   think there's any controversy that the law says that that's

25   what's supposed to happen, and that's what the *Skilling* case

1   essentially says -- those are their documents already, so I

2   have a hard time believing that there is any obligation for us

3   to go through their documents and point out the exculpatory

4   material to them.

5       As to the grand jury subpoena material, that was also

6   turned over to them in the form in which we got it.  And most

7   of that material is of a limited volume compared to the other

8   material.

9       Also, I'm not aware that any of that material falls into

10  any of the categories that Mr. Weiland is talking about, but we

11  can talk about specific issues if there have been.

12      As to the Government's material, --

13          THE COURT:  So, so stop.

14          MR. RUNKLE:  Yes.

15          THE COURT:  So are you saying that the productions

16  were general discovery productions and not specific as to

17  *Brady/Giglio*?

18          MR. RUNKLE:  That's correct.  Well, we reviewed -- so,

19  for example, here's how we did the Government documents.  So

20  those documents were turned over in the form in which we got

21  them, *in toto*, in their entirety.  So they have all of those

22  documents.  All the third-party documents that have been

23  received by the Government in this case have been turned over.

24          THE COURT:  I guess -- and I understand that.

25          MR. RUNKLE:  Uh-huh.

```
 1              THE COURT:  But what I don't understand is how that

 2      relates to your Brady/Giglio obligations unless you've

 3      identified in those terabytes of documents something that would

 4      tend to be exculpatory.

 5              MR. RUNKLE:  Well, that goes straight into the

 6      Skilling case, because we believe that they are in the exact

 7      same position as we are to be able to review the documents and

 8      identify the material.

 9              THE COURT:  Only if you've not specifically come

10      across something, I would think.  If you specifically come

11      across something and you're basically counting on it being

12      hidden in what you've provided -- and I'm not talking so much

13      about their documents --

14              MR. RUNKLE:  Uh-huh.

15              THE COURT:  -- that have been provided back to them,

16      but the documents from the grand jury, then it seems to me a

17      problem.

18              MR. RUNKLE:  Uh-huh.  Well, the grand jury material I

19      can say is -- it was provided to them in the same format, and I

20      don't believe that the Government -- a lot of that material is

21      not even reviewed by the Government.  So it was -- we did

22      searches on it, we found some documents, and those documents

23      were either incorporated into the indictment or they've been --

24      or a lot of that material hasn't even been reviewed.

25          So it would be very difficult, as I think we've pointed out
```

1    in our brief, for us to say that we've done an *in toto* review

2    of all these documents.

3           THE COURT:  But you've not answered my question yet,

4    --

5           MR. RUNKLE:  Uh-huh.

6           THE COURT: -- which is whether you have, in the

7    documents you have reviewed, found something that would fit the

8    definition of information that should be turned over under

9    *Brady* or *Giglio*, and realizing that, simply included those

10   documents in the discovery that you pushed out.  So I'm talking

11   about more knowledge on your part than --

12          MR. RUNKLE:  Uh-huh.

13          THE COURT:  I mean, either you don't -- you didn't --

14   you reviewed it and you didn't find anything, or you reviewed

15   it and you found something and you didn't specifically identify

16   it, you just turned it over with a bunch of other documents.

17          MR. RUNKLE:  Well, I think that's -- I don't want to

18   push back on the Court's question.  We didn't hide any

19   documents.  I think that's the concern of a lot of the cases.

20   So there's no -- there's no attempt to segregate *Brady*/*Giglio*

21   and then hide it within the documents that were there.  And we

22   can have a discussion about what is exculpatory.  This is --

23   Mr. Weiland's conception of what's exculpatory is anything that

24   reveals his client was not on a specific email chain.  And so

25   using that definition, there's plenty of *Brady*/*Giglio* in there,

 1  and that would be every email chain on which his client wasn't

 2  a part.  And so that is -- was provided to them as part of

 3  their own emails.

 4      But let me tell you about what we did with the Government

 5  documents, which I think are sort of the core of Mr. Weiland's

 6  concern.  So, the Government documents were reviewed multiple

 7  times for -- specifically for this issue.  So there was a first

 8  attempt to send all the non-privileged documents out.  So there

 9  was a screening for any attorney names, any Government attorney

10  names, and all those documents went out that we collected from

11  FDA.  Then what happened was we went back and we took the

12  attorney collection and we reviewed every single one of those

13  documents to say, is there anything in here that could be

14  potentially *Brady* or *Giglio*, and those materials were then

15  turned over.

16      And I'm not recalling right now whether that was a separate

17  production, but there was a very limited amount of material

18  that, out of an abundance of caution, we did turn over, because

19  we thought, well, this is something that could potentially be

20  exculpatory or it could be *Giglio* down the line, depending on

21  what witnesses are called.

22      So that's the length that we've gone to to try to answer

23  this issue, is we've actually turned over what would be

24  privileged material in order to fulfill our *Brady* and *Giglio*

25  operations.

1    Another example of what we've done is Mr. Weiland was

2    talking about certain tests that were conducted.  So the

3    Defense raised to us in a number of detailed letters, they

4    actually point out something that we were unfamiliar with prior

5    to them pointing it out, which was that a very limited study

6    was done by a scientist at the National Center for Natural

7    Products Research in Mississippi on their product back at the

8    time of the outbreak.  And so what we did when we found that

9    out, we were interested in it because we frankly didn't know

10   about it, and so I sent a paralegal who spent three days in

11   Mississippi collecting documents on those topics, any document

12   in existence, and that was turned over in a production along

13   with the expert discovery, because one of the scientists who

14   did that research worked on our expert discovery also.

15       So that's the length that we've gone to to fulfill our

16   obligations in this case.  And it's -- you know, Mr. Weiland's

17   sort of conjecture about there must be documents out there,

18   well, there are documents that he would consider exculpatory

19   and that out of an abundance of caution we may consider

20   exculpatory, too.  But I'm not going to send him a list of

21   documents when his conception of *Brady*, he's described it to

22   you, it's anything that reveals his client wasn't as involved

23   in the criminal conduct as the other defendants.  Well, that's

24   -- that may or may not be *Brady*, but he has all of that

25   material and we've, you know, we've taken a lot of effort to

1   get those materials.

2       The other example that Mr. Weiland gave to you was patient

3   files.  So what I can tell you is that not a single -- to my

4   knowledge, not a single patient file in the possession of the

5   Government has been withheld on any basis, and there's not

6   going to be an eve-of-trial dump of *Brady/Giglio* if I can help

7   it.  I mean, there's no *Brady/Giglio* sitting back there waiting

8   to be --

9           THE COURT:  What do you mean, if you can help it?

10          MR. RUNKLE:  Well, there -- this is a very large case

11  and they have had numerous run-ins with FDA for many years.

12  And so when we go back and ask what FDA scientists touched this

13  case, that list has expanded over time.  And as another example

14  of the lengths that we're going to, we are about to send to the

15  FDA a list of something like 25 additional custodians, out of

16  an abundance of caution, to have their emails and documents

17  searched to determine whether they have any materials that

18  could be considered exculpatory in this case.  Because FDA is a

19  very large agency, with something like 10,000 employees, and so

20  it's just impossible for us to know exactly everything that's

21  going on in the agency, and so we've had to do a lot of work to

22  try to get these documents and to try to fulfill our

23  obligations.

24      And it is an ongoing process.  It's a large criminal case,

25  and that's where we are right now.  We have six months until

1    trial right now, as long as the trial doesn't get delayed

2    again, and we are working very hard to get the materials out.

3    We just did another production the other day because FDA had a

4    technical problem with its email server where some of the

5    attachments were getting archived in a different -- in an

6    incorrect place.  And so we spent months going back to FDA and

7    trying to manually pull attachments out of emails to try to get

8    those attachments and link them with their parent emails and

9    then send them to the Defense.  And so that's the kind of work

10   that we've been doing to try to fulfill these obligations.

11        And so when I said if I can help it, I mean we are trying

12   to complete discovery as quickly as we can.  That's what I

13   mean.  But there are obviously -- in the government, there are

14   agency concerns, there are agency resource considerations, and

15   we are working as fast as we can.  But the vast majority of the

16   discovery and the major custodians in the case were turned over

17   a long time ago, a year and a half ago, along with all the

18   search warrant material and all of these materials.  So that's

19   where we are.

20        Thank you, Your Honor.

21          MR. WEILAND:  Your Honor, just a couple of things.  I

22   want to mention that -- excuse me.  I want to mention, as an

23   aside, something Mr. Runkle just alluded to, that the trial was

24   six months away if the trial happens.  You know, my client has

25   been adamant about wanting to get to trial, and the Department

1   of Justice represented to a federal judge in Virginia recently

2   that there was -- that they didn't think the trial would go in

3   January of 2018, this trial.  And so I'd appreciate the Court's

4   inquiring for the benefit of my client about whether the

5   Government anticipates yet another continuance.  Because he's

6   saying they're still making discovery, they're doing the best

7   they can.  We got the indictment in November of '15 and

8   obviously we weren't ready, but we're trying to get ready.  So

9   I'd appreciate that, Judge.

10       The other thing he said that I thought was most interesting

11  was, we don't -- we do not hide anything.  And then he said, we

12  did the screening for attorney names and then we reviewed the

13  attorney collection and sent some things over that could

14  possibly be exculpatory.  Well, they didn't tell me they were

15  sending anything over that could possibly be exculpatory, so

16  there it lies in the three terabytes or he said seven terabytes

17  possibly of information.  And that's not -- that is not the way

18  *Brady* disclosures are supposed to work.

19           MR. ROPER:  Your Honor, can I interpose?

20           THE COURT:  Do you represent Mr. Hebert?

21           MR. ROPER:  I just -- my concern is that they want

22  wiggle room to not have a specific deadline to produce *Brady*

23  material.  And I'm concerned by the wiggle room they're having

24  that it can include this -- another absolute massive dump,

25  document dump.  And if you read the *Skilling* case, they even

1   are concerned about the issue of when you have a document dump

2   and you have to go through a massive amount of evidence to --

3   so I think it's appropriate to have some kind of deadline.

4   Many of the district judges here have deadlines to produce

5   *Brady* material.  If you look at the case --

6           THE COURT:  But Judge Lindsay didn't have such a

7   deadline in his scheduling order.

8           MR. ROPER:  He didn't.  Now, if you look at the case,

9   that *Pinon* case he cites, --

10          THE COURT:  Uh-huh.

11          MR. ROPER:  -- it does say and really what the

12  Government is saying is as long as you give it to them before

13  trial, it's good enough for essentially government work to do

14  it, to produce it by the deadline.

15          THE COURT:  Well, in time enough for them to make good

16  use of it.

17          MR. ROPER:  Now, if you read the opinion, though,

18  Judge Lindsay relies on the fact that the Government says,

19  look, as soon as we get it, we're turning it over.  I don't

20  think that's enough in this case.  And the reason is, after the

21  indictment in the case -- and this turns on the dangerousness

22  of these dietary supplements -- after the indictment, they

23  commissioned a study to try to shore up what I think is their

24  insignificant evidence to show that these dietary supplements

25  are dangerous.  They commissioned it after the indictment and

1   they turned that over.  And because of that, we've scurried

2   around to try to respond to it.  But all that involves what

3   their experts consider dangerousness.  Some of them rely on

4   patient files.  And what I'm afraid of, because of the kind of

5   unique circumstances in this case, I'm afraid, whether the

6   Government says they're using their best efforts or not, that

7   we're going to get to the eve of trial and have a bunch more

8   evidence, even maybe more test results, that we're going to be

9   scurrying around trying to get ready for trial, and then Runkle

10  will -- Mr. Runkle or the Government will then say, well, you

11  know, look, here's Judge Lindsay's opinion.  As long as you

12  give it to them before trial, you're in good shape.

13       So I think there's -- it's -- this is kind of an unusual

14  circumstances that I think require a deadline for the

15  Government to produce any *Brady* material.  I don't think it's

16  inappropriate.  We're six months from trial on a massive case.

17  We may have a week of *Daubert* hearings in this case.  I think

18  it's appropriate to put the Government to a deadline where

19  they're obligated to produce before trial.

20       And you know, it's -- look, it's not our fault that it's a

21  massive case.  The Government decided to bring it.  And if

22  they're big enough to bring the case, then they are big enough

23  to live up to a deadline to produce *Brady* material.  And if

24  it's a document dump, then identify what they have.

25            MR. RUNKLE:  Thank you, Your Honor.  There's not going

1    to be a document dump in this case.

2        What has happened is essentially a waterfall in that there

3    are -- they have kept requesting documents when they have been

4    going through the Government documents, and they've said,

5    what's this, what's that?  And some of those things, we didn't

6    know about, and so we've gone back and gotten limited amounts

7    of material to fulfill their requests.  But they've -- what I

8    am not representing today is that that material is *Brady*

9    material.   They've requested a lot of additional documents

10   from scientists at FDA who may or may not have sent an email at

11   some point in 2012 about the Defendants.  And so that may or

12   may not be *Brady* material, but I'm trying to fulfill my

13   obligations to get that heretofore unknown email, read it, and

14   turn it over to the Defense as I get it.  There's not going to

15   be a document dump.

16            THE COURT:  Mr. Runkle, let me ask you this about

17   something that you discussed previously.

18            MR. RUNKLE:  Uh-huh.

19            THE COURT:  When you went through the Government's

20   documents, --

21            MR. RUNKLE:  Uh-huh.

22            THE COURT:  -- what you identified as the Government's

23   documents, and determined that these subset of documents may be

24   *Brady/Giglio*-type materials and you turned those over, did you

25   turn those over separately or with something?  And also, what

1   was the volume of that?

2         MR. RUNKLE:   That volume was very limited.   I think it

3   was less than 50 documents, maybe less than 20.   And I don't

4   believe it was buried in any other production.   I have to

5   check.   I frankly don't remember.   I know that we conducted

6   that review.   I believe the results of that review was that a

7   few documents were identified and that those documents were

8   promptly turned over.   That's what I recall about that.

9         And I wanted to respond to Mr. Weiland's discussion about

10  the scheduling of the case.   What happened was that one of the

11  Defendants was convicted of fraud in the Eastern District of

12  Virginia and is now in federal prison.   And he tried to get out

13  of prison because he wanted to come to the hearing today.   He

14  tried to stay his self-surrender date so he could come to the

15  hearing today.   He got a sentence of eight months and he's

16  incarcerated outside Bakersfield in California.   And so one of

17  the arguments in that case was that he needed to be out to be

18  able to assist in the defense of this case.

19        That was handled by a completely different AUSA, who I've

20  had very limited contact with.   You know, several phone calls.

21  I believe the judge in that case found that the complexity of

22  this case and the filings on the docket and the number of

23  pending motions indicated to him, as I think it would indicate

24  to any reasonable observer, that maybe this case might be

25  delayed again.   It is not the Government's intention to delay

1   this case.  We would be happy to take this case to trial in

2   January.

3       And as to Mr. Roper's contention that there should be a

4   deadline, if Judge Lindsay wants to set a reasonable deadline

5   or Your Honor wants to set a reasonable deadline, I think that

6   that would be appropriate, but, you know, that deadline is not

7   tomorrow.  And the Defense is the ones who request -- they are

8   the ones who requested early *Daubert* motions.

9           THE COURT:  When is that deadline, then, in your

10  estimation?

11          MR. RUNKLE:  Well, we defer -- this is a case being

12  run out of Washington.  We defer to local practice.  Judge --

13  we understand that Judge Lindsay prefers to defer to his

14  standard practices.  If we want to have a discussion with Judge

15  Lindsay or Your Honor about if that deadline or his standard

16  practices need to be varied in this case, I would be happy to

17  have that discussion.  But I don't think it needs to be in the

18  context of this motion, because this motion is not about

19  scheduling.  It's about, you know, pretrial disclosure of *Brady*

20  material, which we have committed to do.  So I appreciate the

21  opportunity to discuss it.

22          MR. WEILAND:  Can I just say one last thing, Judge?

23  I'm not going to argue with him.  I'm just going to point out

24  that I have a proposed order that I can file in the normal

25  course or I could hand it up that calls for them to do the

1    production within 30 days and as soon as practicable but no

2    less than 90 days prior to trial to produce these -- some of

3    these other things we've talked about.

4              THE COURT:  Okay.  I appreciate that.  You know, the

5    problem with the ongoing *Brady/Giglio* responsibility or

6    obligation of the Government is that it is ongoing and there is

7    no certain date that it ends so that the Court can say, by this

8    date, all the *Brady/Giglio* materials that the Government is

9    aware of must be turned over.  However, to the extent that the

10   Government already has identified *Brady* and *Giglio* materials,

11   I'm troubled with the notion that that doesn't have to be

12   turned over pretty much immediately.

13        In this case, Mr. Runkle, you've indicated here that you,

14   as to -- and I agree with you as to the items that were seized

15   from Defendants.  Defendants should be able to look through

16   their own documents and determine if anything tends to

17   exculpate.  You know, but as to the -- what you call the

18   Government's documents, the fact that there were these

19   approximately 50 -- and I'm not holding you to that number --

20   but these 50 documents that were turned over and it wasn't

21   identified when it was turned over as a *Brady/Giglio*

22   production, in light of all the terabytes of information

23   involved in this case and that have been turned over, sounds a

24   lot like a data dump.

25        For that reason, I'm only going to grant the motion to this

1   extent.  To the extent that you've already identified

2   *Brady/Giglio* materials, and even if you've produced those, I am

3   going to require you within 14 days to advise defense counsel

4   which of those documents you identified as potentially

5   *Brady/Giglio* and produced already.

6       As you prepare for trial and prepare for this case and

7   become aware of other documents or other types of evidence that

8   would tend to exculpate, fit the definition of *Brady* and/or

9   *Giglio*, I'm going to require that within 14 days of your

10  discovery of such, that you turn those materials over to the

11  defense and you let them know that it is a production pursuant

12  to your *Brady/Giglio* obligations until this case is tried.

13      I'm not going to require you to stop preparing for your

14  case and look through every document you have and decide

15  whether or not it fits the definition of *Brady* and *Giglio* at

16  this time, but as part of preparing your case, you will

17  naturally do that, and you have done that.  And so I believe

18  you have an obligation beyond simply just turning that over.

19  You have an obligation to timely turn it over within a timely

20  manner of you discovering it.  And as, again, that obligation

21  is ongoing, I would expect that any production would be

22  ongoing.

23      And so to the -- so to the extent Mr. Weiland on behalf of

24  Mr. Hebert seeks additional relief, that relief is denied.  So,

25  --

1          MR. WEILAND:  Thank you, Judge.

2          THE COURT:  Then let's move on to -- and let's not

3    start with the Government's cross-motion, because, frankly,

4    when I read it, as far as argument goes, it seemed to me

5    premature.  If the Defendant or no Defendant had specifically

6    made a claim or sought a protective order regarding any

7    privilege or work product, attorney-client privilege or work

8    product information, there is no relief to be granted in a

9    cross-motion.  You know, but it does relate to the

10   subsequently-filed motion for protective order, and so I'm

11   ready to take that up, you know, as to USPLabs and Defendants

12   Geissler -- is that how you pronounce it?

13         MR. NIEWOEHNER:  Geissler, yeah.

14         THE COURT:  Geissler, Doyle, and Hebert.

15         MR. NIEWOEHNER:  Thank you, Your Honor.  I'm Chris

16   Niewoehner.  I'm here on behalf of the USPLabs.  We appreciate

17   the opportunity to sort of synthesize -- what you just said

18   makes a lot of sense in terms of how to handle this.  The

19   protective order motion subsumes a lot of the cross-motion

20   issues.  With your permission, I'm going to ask my colleague,

21   Mr. Linehan, at one point to address a portion of that.

22      So, Your Honor, in our motion for protective order, the

23   Defense has laid out a culmination of a series of missteps and

24   errors by the prosecution in this case that relate specifically

25   to the handling of privileged materials.  There's five

1    different phases of this case: the search warrant application

2    itself, the execution of the search warrant, the use of the

3    search warrant materials, the taint procedure that's been

4    identified, and even the filings in this case.  And in each of

5    them, the Government has demonstrated -- has an indifference or

6    a refusal to fully protect obviously attorney-client privileged

7    documents.

8          THE COURT:  Let me stop you there, because it looks

9    like to me that in the Government's response that they are

10   repeatedly stating that they haven't identified this attorney-

11   client privileged or work product information or material.  And

12   if you haven't specifically identified it to them, how could

13   they ever know that it needs some special protection?

14         MR. NIEWOEHNER:  Well, I think, broadly speaking, we

15   have, in the sense of at the very beginning --

16         THE COURT:  But under every rule regarding attorney-

17   client information, it's not broad.  It's something specific.

18   There is some specific thing.

19         MR. NIEWOEHNER:  Okay.  And we have given them -- when

20   I meant broad, I meant in the sense of communications between

21   an outside law firm, an outside civil firm handling matters

22   that are directly the subject of the search warrants in this

23   case.

24         THE COURT:  Well, that's not quite the definition of

25   privilege, but go ahead.

1              MR. NIEWOEHNER:   There -- that topic, --

2              THE COURT:  Yes.

3              MR. NIEWOEHNER:   -- those lawyers have handled things.

4    There have been communications, there's been work product that

5    was unquestionably seized by the Government.   They acknowledge

6    that.   There's no confusion that there is what would normally

7    be attorney-client privileged materials.   In fact, their taint

8    team to date has identified 41,000 documents that they say are

9    privileged.  So I don't think there's any --

10             THE COURT:  So if the taint team identified them, are

11   -- is it your position that despite the fact that the taint

12   team identified them, the Government has made some use of them?

13             MR. NIEWOEHNER:  Our concern and why we're trying to

14   take this really one very limited step at a time, we are not

15   trying to get ahead of ourselves here, we are asking for

16   discovery to more fully answer the question you just posed.

17   Because what I can tell you today from the evidence we've been

18   given is not just the history I just described but I want to

19   show you specifically in their taint team protocol the evidence

20   that shows that they don't know whether their taint team has

21   identified documents they otherwise would acknowledge would be

22   attorney-client privilege.  Their taint team process is broken

23   in one way, and we don't understand how because -- and that's

24   why we're asking for discovery, effectively.  We want

25   information.

1          THE COURT:  Let me ask you this.  But are these

2  documents documents that they actually took so that you don't

3  have access to them, or that they imaged so you do have access

4  to them?

5          MR. NIEWOEHNER:  We do have access to them because

6  these are things taken out of the search warrants.  So they

7  took --

8          THE COURT:  So have you reviewed the materials that

9  were taken to determine which ones you are concerned about?

10         MR. NIEWOEHNER:  We did a snap -- we gave examples.

11  We have not tried to go through the hundreds of thousands --

12  there's three million documents at issue.  We have not tried to

13  do a privilege log of every single document.  But what we have

14  done is we said, well, tell us which documents you've screened

15  out as privileged and we can focus on the section you haven't

16  screened out.

17     And what we did is we provided examples in our motions,

18  specific examples, and said, look, based on what you're telling

19  us, this should have been in the taint folder.  This should

20  have been identified as privileged.  And they've come back now

21  with an answer, and I want to focus on the answer, and the

22  answer demonstrates that they cannot assure the Court that

23  privileged materials isn't being handed over to the

24  prosecution.

25     Now, I don't know today what Mr. Runkle has looked at, so I

1    can't tell you today which document that was privileged that he

2    has seen because I don't have access to that information.

3    We're trying to take this one step at a time and we're trying

4    to identify what are the problems in their process that would

5    allow Mr. Runkle to see otherwise clearly privileged materials.

6         And our -- again, small steps.  We're not asking for the

7    world here.  This is a very significant issue in this case.

8    Attorney-client privilege is sacrosanct in any case, but as --

9    there's been in the papers that you've seen, as we've raised,

10   there were civil attorneys providing advice on the very topics

11   that they're being charged with.  I'm not asserting any kind of

12   defense right now.  I'm just noting what's in the papers.

13        It is therefore very important to us to determine that the

14   attorney-client privilege is respected.  And the history of

15   this case says it has not been respected.  And we believe that

16   history gives Your Honor the basis to go further, to require

17   the Government to answer questions that, quite frankly, are no-

18   brainer questions in many contexts.  How did your taint team

19   work?  What was screened?  What search terms did you use?  When

20   did you do this?  Who was involved?  What process did you

21   follow?

22            THE COURT:  Then are you talking about providing more

23   detail than was provided in the affidavits that were attached

24   to the -- what I have determined is related Government's cross-

25   motion?

1          MR. NIEWOEHNER:  Yes.  And I want to show you

2    specifically the more detailed affidavit they did and point to

3    the questions that it raises for me that are not answered, the

4    problems that emerge from their representation.  It doesn't

5    solve things.  It makes it worse.

6          THE COURT:  Well, are you going to get into the

7    specific instances that would support your argument for good

8    cause to issue a protective order?

9          MR. NIEWOEHNER:  Yeah.  I mean, I -- we're doing --

10          THE COURT:  Or is someone else doing that?

11          MR. NIEWOEHNER:  I was going to do that, Your Honor.

12          THE COURT:  Okay.

13          MR. NIEWOEHNER:  So I'm happy to sort of walk through

14    for you the history that we strongly encourage you says --

15    gives you the factual basis to do the protective order and to

16    order the additional information be delivered that we're

17    seeking.

18      So, as a threshold matter, the Government has suggested you

19    don't have the power to do anything here.  They say that Rule

20    16(d)(1) doesn't give you the power to police effectively the

21    treatment of privilege here.  And we've demonstrated to you

22    that's not the case.  Rule 16(d)(1) if a very flexible statute.

23    It provides for any -- you can grant any appropriate relief.

24      And their suggestion to you is they say, well, of course,

25    if there was a clearly wrong privilege review process, you --

1    that's improper.  They acknowledge that in the papers.  But

2    they say the remedy for that is that, at trial, if they sought

3    to admit a privileged document, we could move to exclude it.

4    That's woefully inadequate, because imagine this scenario.

5         THE COURT:  Well, that may -- that's why there are

6    taint teams, so --

7         MR. NIEWOEHNER:  Well, that would be part of what we

8    could do, sure.  But what the --

9         THE COURT:  Uh-huh.  But you don't want it to get to

10   that point?

11        MR. NIEWOEHNER:  Exactly.  And because there's many

12   ways short of actually admitting something at trial.  In their

13   situation, a prosecutor could knowingly and willfully decide to

14   look at all the privileged documents, get the strategy that

15   they would never otherwise know, be smart enough not to -- or

16   not -- or not be stupid enough to actually put one of the

17   privileged documents into evidence, just use all the

18   information.  Under their proposal, there would be absolutely

19   nothing that could be done about that.

20      That is not the law.  It is clear that that can't be the

21   case.  This Court under Rule 16(d)(1) -- and quite frankly,

22   under your inherent power to supervise cases, and particularly

23   in the context of attorney-client privilege -- has the power to

24   order what you deem appropriate to protect the privilege.

25      So, once you move beyond that threshold step, let's just

1   take a look at the history, the pattern and practice here.

2   This is a complicated case.  It's a large corporation.  This is

3   not your sort of normal small-time fraud, drug, whatever, fill

4   in the blank.  And that's been known from the beginning.  And

5   this is -- when we -- when I said there's five phases, I'll

6   walk you through.

7       The first one is the search warrant application itself.

8   There is no question that the Government knew when they sought

9   the first search warrant in this case, which they brought

10  before Your Honor, they knew that USPLabs was represented on

11  matters that overlapped with what they were seeking the search

12  warrant for.  We gave you the history, the back and forth

13  between the government agencies.  DOJ knew that.  They also

14  knew they were going to be submitting a search warrant seeking

15  essentially the entire computer system at the corporate offices

16  of USPLabs, meaning they're going to get the email.

17      It is not rocket science to realize, if you're going to get

18  all the email from the company, you're going to get

19  communications with lawyers.  That is a salient fact here.

20  That is a fact which Your Honor would have had no idea.  They

21  gave you no notice whatsoever.  And for you to do your job as a

22  judge, to ensure that an *ex parte* search warrant is appropriate

23  and is tailored to what it needs to get, that's information you

24  should have had.  And they knew.

25      But that's not the end of the story.  They go and they

1  execute the search warrant that day.  They're told repeatedly,

2  as evidenced by their own declaration by Ruth Brewer, a lawyer

3  at the scene, that she was a civil attorney who represented

4  USPLabs and she pointed out different parts of the offices that

5  were used by attorneys, and they say they tried to respect

6  that.  Maybe they did, maybe they didn't.  But they are given

7  -- and they also had a conversation, the lead Texas prosecutor

8  had a conversation with an attorney for the firm who also

9  pointed out, again, privilege is at issue here.

10     Later that day, they go back in and they get a second

11  warrant, this time for Mr. Geissler's house, where they knew

12  Ruth Brewer, the civil attorney, also lived.  They knew they

13  were going to run into the issue of legal communications, and

14  again they told the judge nothing.  There's no notice, there's

15  no taint procedure, nothing.  There's no way for the judge --

16          THE COURT:  Well, that's an interesting situation

17  since they live together, I mean, so --

18          MR. NIEWOEHNER:  It's not the norm perhaps, but this

19  is something that --

20          THE COURT:  Or that they'd be conducting their legal

21  business as a part of their personal business.

22          MR. NIEWOEHNER:  But they knew it, and there's no way

23  the judge would know it, and they did nothing to protect

24  whatever privilege would be there.

25     And it gets worse.  A week after the search, there's an

1    explicit conversation between Mike Uhl on behalf of the company

2    and the AUSA in Texas, and it's raised that you took attorney-

3    client privileged materials.  Two weeks later, they go in for a

4    third search warrant, seeking the email communications.  There

5    is nothing in the search warrant to alert the supervising judge

6    that there is a privilege issue here.  There is no protection.

7    At each one of those steps, they easily could have told the

8    judge at least this is going on, these are the procedures we

9    were going to address.

10        THE COURT:  So is it your suggestion that if the

11   judge, including myself, would have known that there is the

12   possibility of seizing attorney-client information, the

13   warrants wouldn't have been issued?

14        MR. NIEWOEHNER:  I think Your Honor would have had the

15   opportunity to at least say, what are you doing about the

16   privilege?  How are you going to comply with your duty to make

17   sure that nothing -- follow DOJ policy that nothing is going to

18   be done that doesn't have to be done, protections will be put

19   in place?  That opportunity was completely gone.

20        It doesn't mean that ultimately the search warrants --

21   maybe they would have been granted exactly as they are.  I

22   don't know.  That's not where we are today.  But I feel that

23   Your Honor would have wanted to know that information, and we

24   would want Your Honor to know that information, because then

25   you would be -- again, *ex parte* situation, you'd be in a

 1  position to say, hey, what are you going to do about the fact

 2  that there's going to be attorney-client privilege materials

 3  there?  They deprived the Court and thus the Defendants of that

 4  line of defense.  And they had multiple opportunities to do it,

 5  and each time they failed.

 6          THE COURT:  Well, let's fast forward, because this

 7  relief that you're seeking isn't dependent on that.

 8          MR. NIEWOEHNER:  No.  This is just part of the story.

 9          THE COURT:  Okay.

10          MR. NIEWOEHNER:  So let's go to the second phase, the

11  actual execution of the search warrants.  Again, I told you

12  about attorneys on the scene trying to tell the Government that

13  this is going on.  And what they took was every single email in

14  the entire system.  They did nothing on the scene to protect

15  it.  They did not have a taint team in place, and their

16  procedures were nothing.

17      On top of that, as they've now admitted in their agent's

18  declaration, the case agent, at the house, during the search of

19  the house, took a cell phone belonging to a civil attorney who

20  represented the company, and he went through the text messages.

21  Now, I don't know from the -- from the information they've

22  provided, they claim it was for physical safety.

23          THE COURT:  Has she identified to you what these

24  materials are that are apparently attorney-client privilege?  I

25  mean, I just can't imagine there were troves of documents in

1   the house that were actually privileged in their residence, in

2   their personal residence.

3          MR. NIEWOEHNER:  Well, she had a home office where she

4   did work.

5          THE COURT:  Okay.  I heard --

6          MR. NIEWOEHNER:  So her --

7          THE COURT:  I saw there was supposed to be a sticky or

8   something on the door that said law office.

9          MR. NIEWOEHNER:  That's right.  She tried to -- I

10  mean, part of what she tried to do is highlight this is a legal

11  office.

12         THE COURT:  Okay.

13         MR. NIEWOEHNER:  She put a sticky on the door.  She

14  told them.  But computers are taken, documents are taken, there

15  is no taint team in place.

16         THE COURT:  Well, the Government says that when she

17  told them, I believe -- am I thinking of the wrong one? -- that

18  these are privileged, they didn't take those.

19         MR. NIEWOEHNER:  They say at the warehouse that they

20  -- that there are certain rooms she designated as being

21  attorney areas essentially and that they tried not to take

22  those documents or they didn't take those specific computers.

23  What, of course, that ignores is, you know, you don't take the

24  lawyer's computer, but guess what?  The email between the

25  lawyer and the guy sitting next to him is on the other guy's

1  computer.  It's there.

2      So it's an inadequate protection to simply not take that

3  lawyer's computer and still --

4          THE COURT:  But she could tell -- she should be able

5  to tell what they are, though.

6          MR. NIEWOEHNER:  We can go back and try to recreate

7  some of these things about what --

8          THE COURT:  Well, they should be there.  You're saying

9  that there are duplicates on other people's computers.

10          MR. NIEWOEHNER:  Right.

11          THE COURT:  Then she should be able to say and could

12  have informed you that these are the specific things that I'm

13  concerned about.

14          MR. NIEWOEHNER:  And we have -- again, I have not

15  tried to do a privilege log of every communication, in part

16  because we're trying to figure out from them what they've seen

17  and what they've not seen.  We have recognized that a taint

18  team process can protect the Defense from the prosecution team

19  from seeing the damage, or seeing the privileged documents.  So

20  just because they took a privileged document is not necessarily

21  the end of the story.  It's what has been made available to the

22  prosecution team, and that's where we need help.

23          THE COURT:  Okay.  Well, let's get to that.

24          MR. NIEWOEHNER:  Okay.

25          THE COURT:  Okay.

1          MR. NIEWOEHNER:  So, again, in terms of -- may I do

2     one more stage before I get to the taint process itself?

3          THE COURT:  Okay.

4          MR. NIEWOEHNER:  My third point is the use that the

5     prosecution team has made of the seized material.  And we've

6     raised the situation of what happened in Hawaii.  I'm not going

7     to belabor it other than to note that the prosecution team was

8     in close communication with the Plaintiff's firm out in Hawaii.

9     It's a firm called Andrews & Thornton.  Before -- we were

10    looking at this before September 29, 2015.  There was something

11    like over 20 emails and letters about witness interviews in

12    this four-year approach that they produced today.  We, of

13    course, don't know what the oral communications were, but this

14    is a close relationship.

15         And what they did is they took the entirety essentially of

16    the data -- of the server they took and they dropped it in the

17    lap of the Hawaii judge.  And the Hawaii judge chastised them

18    and said, I didn't know you were going to do this, and he sent

19    it back.  And a second judge who was apprised of the situation,

20    as we noted, called it arbitrary and capricious and possibly

21    criminal, which I don't think people lightly say of the

22    prosecution.

23         And if you look at what the Plaintiff's attorneys tried to

24    do, they then made an argument which said USP, you don't even

25    get to see your own documents.  We get to look at this.  So the

1    effect of what happened was that the Plaintiff's firm had a

2    shot at getting the entirety of our computer server without us

3    even getting a chance to look at it and protect our privilege.

4    That was --

5               THE COURT:  Since then, have you gotten it?

6               MR. NIEWOEHNER:  It has been returned.

7               THE COURT:  Okay.  And have you had an opportunity to

8    see whether or not it contained privileged information or work

9    product information?

10              MR. NIEWOEHNER:  I should be more careful.  I believe

11   the physical object that the prosecution sent to Hawaii was

12   returned to the prosecution.  My understanding is that that

13   server is the same server that they copied and gave to us.  So

14   I don't have -- we don't have the specific object, but I do

15   believe we have a copy of what it was.

16              THE COURT:  Right.  So if you're concerned that they

17   violated privilege by sending that, then certainly you could do

18   a search and determine which of that was.  It's hard for any

19   judge to make a determination as to whether there is privileged

20   information that needs to be protected if you don't identify

21   it.

22              MR. NIEWOEHNER:  Right.  And understood.  I'm using

23   this more as an example of the pattern of practice of

24   indifference to our privilege, as opposed to asking Your Honor

25   to do a specific remedy for that specific situation.

1          THE COURT:  Okay.  Because, you know, you've got to

2    show good cause.

3          MR. NIEWOEHNER:  I think that's what we're doing --

4          THE COURT:  Okay.

5          MR. NIEWOEHNER:  -- by showing these recurring steps

6    where mistakes, error, bad judgment, each of those things I

7    think can contribute to Your Honor's ultimate finding of good

8    cause that additional discovery is warranted.  And again,

9    that's all we're asking for.

10       So what I'd like to do next is to produce -- show you

11   specifically -- and with Your Honor's permission, I'll give you

12   what is the Government's declaration.  And I just want to

13   highlight two particular paragraphs or three particular

14   paragraphs for you.  Can I do that?

15       So this is what was attached as Exhibit 4 to Document 234,

16   or Docket #234-5, which is Exhibit 4 to the Government's

17   motion.  And this is the declaration from the Government that

18   lays out the more detailed explanation of what their taint

19   process was.  And if you -- a few things about it.  If you look

20   at Paragraph 4, it starts saying that since April 2014, the

21   taint team has received approximately three million documents.

22   Well, that raises an immediate question to me, which is, the

23   search was conducted in November of 2013.  What happened

24   between November of 2013 and April of 2014?  Did literally

25   nobody look at anything the entire time for six months?

1    THE COURT:  Which isn't a bad thing because you're

2    concerned about it being revealed, but go ahead.  It sounds

3    like maybe they --

4    MR. NIEWOEHNER:  Perhaps literally nothing happened

5    with that.  I don't know.  But that's, again, --

6    THE COURT:  Okay.

7    MR. NIEWOEHNER:  That raises a question to me as what

8    was going on before April of 2014.

9    Going on further, what the declaration explains, as I

10    understand it, is there's roughly three million documents that

11    are produced, that are given to them.  They do a couple

12    screens.  They do what they call a SK Labs relevance screen,

13    which I don't think is pertinent for our purposes.  That was

14    required in a search warrant out in California.  It was looking

15    at SK Labs' materials, not USP, so let's put that to the side.

16    And what they did is they identified search terms.  They've

17    given us a handful.  They say there are hundreds.  I don't know

18    what the list is to assess whether those are the adequate terms

19    or not, but they do these -- they run the search and they

20    identify a world of documents.  They say about 90,000.  And

21    then this taint team looks at the 90,000 and they assess

22    whether it's privileged or not.  And for about 41,000 of them,

23    they assessed it was privileged, and presumably for the other

24    49,000 or so, they're not.

25    And what they said is, we then gave access to the remaining

1    three million to the prosecution.

2              THE COURT:  Uh-huh.

3              MR. NIEWOEHNER:  So at that point there is no limit.

4    If Mr. Runkle were to do a search and a privileged document

5    were to have gone through, he's got it.  He can see it.  We

6    don't know what Mr. Runkle looks at, I'm not asking for him to

7    tell you that today, but that's the fact.  Anything that the

8    taint team didn't --

9              THE COURT:  So what you want, in essence, is to know

10   what documents they considered privileged, potentially

11   privileged, so that you then will review the remainder of the

12   documents -- because you had those documents, or copies or

13   access to -- and determine whether or not others should have

14   been or --

15             MR. NIEWOEHNER:  Well, that's -- and that's what --

16             THE COURT:  -- should have been designated as

17   potentially privileged?

18             MR. NIEWOEHNER:  What we want to know is their

19   process.  And here's why.  We took five examples.

20             THE COURT:  What specifically do you want to know

21   about their process that they've not explained to you?  Maybe

22   that will help me.

23             MR. NIEWOEHNER:  Okay.  The gist of what they say here

24   is, okay, we looked at your five examples --

25             THE COURT:  Uh-huh.

1        MR. NIEWOEHNER:  -- and we agree: none of them were

2   identified as -- by the taint team.  All five are clearly

3   privileged.  They are sent to outside law firms relating to

4   legal matters of the company.

5        So the question is, well, why weren't those five emails

6   identified by the taint team?  And what they do is they go

7   through -- and what's troubling is they admit that for each of

8   these five examples, that specific email wasn't reviewed by the

9   taint team.  And that's a question for me, is if they ran the

10   search terms they claim they ran, these emails should have

11   popped up, but they didn't.

12        And it raises the further question: well, if these emails

13   didn't pop up when they claim they ran the search terms they

14   claim they ran, what other email that should have been caught

15   by these screens didn't pop up and therefore went to that?

16        THE COURT:  Let me ask you this.  Have you had your

17   own IT experts run a search that you believe would reveal which

18   documents were in fact privileged or could be considered work

19   product?

20        MR. NIEWOEHNER:  We ran -- we tried to decipher --

21   what we were given by them is, here's the 41,000 documents that

22   we tagged as privileged.

23        THE COURT:  Okay.  So they didn't give you everything

24   that was seized, --

25        MR. NIEWOEHNER:  No, --

1          THE COURT:  -- all your documents that were seized?

2          MR. NIEWOEHNER:  No.  They did.

3          THE COURT:  Okay.  So on that --

4          MR. NIEWOEHNER:  They've given us --

5          THE COURT:  So on that -- on that --

6          MR. NIEWOEHNER:  Right.

7          THE COURT:  On that universe of documents, did you

8    have your own IT experts -- because you're complaining about

9    their terms and how it didn't reveal this.  What did you do to

10   determine from your own, on your own, which of these that they

11   should have identified as?

12         MR. NIEWOEHNER:  We did a -- we have done some

13   searching.

14         THE COURT:  Okay.

15         MR. NIEWOEHNER:  That's how we identified the five we

16   found.

17         THE COURT:  Okay.  Did you identify any more from

18   this?

19         MR. NIEWOEHNER:  We found other -- yes, we did.

20         THE COURT:  Okay.

21         MR. NIEWOEHNER:  I did --

22         THE COURT:  Have you listed those on a privilege log?

23         MR. NIEWOEHNER:  We have not.

24         THE COURT:  Okay.

25         MR. NIEWOEHNER:  Because it's -- we didn't understand,

1    until we got this declaration, we didn't have a clue as to how

2    they were doing anything.

3            THE COURT:  Okay.  So --

4            MR. NIEWOEHNER:  And we had made our general objection

5    --

6            THE COURT:  -- has this declaration, which I'm trying

7    to get to, I'm asking you what more specific information you

8    want, has this pretty much mooted your request for an

9    explanation of how the taint team process works?

10           MR. NIEWOEHNER:  No.  And let me highlight the

11   paragraph that's --

12           THE COURT:  Please give me some specifics --

13           MR. NIEWOEHNER:  Okay.

14           THE COURT:  -- of what else you want to know.

15           MR. NIEWOEHNER:  Can I direct Your Honor to the very

16   last paragraph, 14?

17           THE COURT:  Uh-huh.  Uh-huh.

18           MR. NIEWOEHNER:  And the declarant says, "I wasn't

19   involved in the collection or processing of the documents that

20   the taint team received and was tasked with reviewing, and

21   therefore I have no explanation for why the taint team did not

22   receive the specific versions of these documents."

23       I want to know --

24           THE COURT:  "But I can only confirm that neither the

25   taint team nor the prosecution has ever had or reviewed them."

1          MR. NIEWOEHNER:  For those five.  What about all the

2     other ones that --

3          THE COURT:  What all the other ones?  Because you're

4     not giving -- you're not even letting anybody see what they

5     are.  You're not identifying what they are so somebody can make

6     a determination of how they might have slipped through, if

7     anybody has reviewed them, who shouldn't review them, namely

8     the prosecution team, and -- or even in fact that they are in

9     fact privileged or work product.

10         MR. NIEWOEHNER:  I understand Your Honor's point.  We

11    can run an electronic search and come up with a slew of things

12    that apparently don't compare.  I get your point on that.

13         THE COURT:  Uh-huh.

14         MR. NIEWOEHNER:  But it wouldn't obviate the question,

15    which is, what did they see already?  Because what isn't there

16    -- we could identify --

17         THE COURT:  Okay.  So you want to know what of the

18    90,000-something documents they identified?  See, that's not

19    what you're saying.  You're not saying of the 90,000-something

20    they identified with their computer search you want to know

21    which 41,000 -- and I'm probably getting the figures wrong --

22    they decided were potentially privileged or work product.

23    You're wanting to know about the three million documents.  How

24    can -- I don't -- how can that --

25         MR. NIEWOEHNER:  So, two things we can do.  One, I'm

1    happy to go and do a search and try to identify search terms

2    and compare it to the 41,000 they have said are privileged and

3    identify examples.

4        But what that's not going to ever explain -- that I suppose

5    will make it more specific -- but it won't explain what process

6    they used, why their own expert confesses, I have no idea what

7    happened here.  She can't explain why the taint team wasn't

8    given certain things.

9            THE COURT:  Well, that doesn't sound like a protective

10   order to me, that relief.  But tell me what more you want

11   specifically them to tell you about their process.  And I can't

12   get that from you for some reason.

13           MR. NIEWOEHNER:  Okay.  So let me try --

14           THE COURT:  It's becoming kind of frustrating.

15           MR. NIEWOEHNER:  Let me try.

16           THE COURT:  Okay.

17           MR. NIEWOEHNER:  What we would like would be them to

18   answer our questions.  We could be happy to give Your Honor a

19   list of the questions as we sit here.

20           THE COURT:  Well, if you want that to happen, you

21   should.

22           MR. NIEWOEHNER:  Okay.

23           THE COURT:  What are the questions?

24           MR. NIEWOEHNER:  And I'm -- I am not in a position to

25   tell you every question right now that we would want to ask,

 1   but I can give you the categories we've identified in our

 2   motion.  We want to know who was on the taint team, when they

 3   were on the taint team.

 4            THE COURT:  And what is that going to tell you?

 5            MR. NIEWOEHNER:  It will tell us, in part, to make

 6   sure they're on the prosecution team, it's -- and to know who

 7   the witnesses will be.

 8            THE COURT:  Well, but they've told you the taint team

 9   people weren't on the prosecution team, so how is --

10            MR. NIEWOEHNER:  For a certain period of time, but not

11   the entirety.  I noted that six-month gap.  This woman who did

12   the declaration wasn't there at the beginning.  So I don't know

13   what happened before November -- before April of '14, this

14   person doesn't have any knowledge.

15            THE COURT:  So you want to know where the documents

16   were, the seized documents were, prior to being turned over to

17   the taint team?

18            MR. NIEWOEHNER:  And what procedure -- what was done

19   before April 2014.  Maybe nothing.  Maybe there was no taint

20   team.

21            THE COURT:  Where they were and if they were accessed.

22            MR. NIEWOEHNER:  Who had access to them.

23            THE COURT:  Who had access to them.  Okay.

24            MR. NIEWOEHNER:  For that initial time frame.

25            THE COURT:  Okay.

1    MR. NIEWOEHNER:  Once the taint team is instituted,

2  I'd like to know all the search terms they used.  We have an

3  example of some of them but we don't know all.  I'd like to

4  know what criteria they used to determine whether something was

5  privileged or not.  They have floated the idea, for example,

6  that nothing is privileged because --

7        THE COURT:  So even if they give them to you, those

8  search terms, and they give you their definition, and based on

9  that you say, oh, that wasn't good enough, --

10        MR. NIEWOEHNER:  Then I -- what that will do is the

11  next step.  We will provide the list of specific examples.  We

12  will try to go through and forensically determine --

13        THE COURT:  Why can't you do that without knowing what

14  their search terms were and the rest of this, since you have

15  the documents?  Why can't you provide -- full circle --

16        MR. NIEWOEHNER:  We will --

17        THE COURT:  -- a list of those documents that you

18  contend were privileged that they might have had access to?

19        MR. NIEWOEHNER:  We can do that independently, but I

20  would say it would --

21        THE COURT:  You should do that independently, because

22  that's how it works.

23        MR. NIEWOEHNER:  We -- all right.  We will.

24        THE COURT:  Uh-huh.

25        MR. NIEWOEHNER:  But that's not going to end the

1    inquiry for us.  Because if we identify a world -- say it's one

2    document, say it's 10,000 documents -- that don't appear to

3    have been screened out by their taint team, that doesn't end

4    the -- that just means, okay, now we've got to figure out what

5    happened over there.  Who --

6              THE COURT:  What do you mean, what happened over

7    there?

8              MR. NIEWOEHNER:  Who saw it.

9              THE COURT:  You identify documents their taint team

10   specifically didn't screen as attorney-client privilege so they

11   turned them over to the prosecution.  And so now you have a

12   list of documents that you contend shouldn't have been provided

13   to the prosecution because they were privileged or work product

14   protected, and then you move for a remedy to that.

15             MR. NIEWOEHNER:  And I guess, Your Honor, what we're

16   asking is, contemporaneously with that, is that you give us the

17   discovery that we're seeking in terms of how their process

18   worked.  Because only one of those two --

19             THE COURT:  Because how is that going to advance the

20   ball?

21             MR. NIEWOEHNER:  Because it will then let us know

22   whether in fact there was some -- was it human error?  Was it

23   willful?  Was it a mistake?  Who saw what?  The consequence is

24   what matters here.

25             THE COURT:  Okay.

1          MR. NIEWOEHNER:  The consequence matters, depends on

2   their procedures, if they in theory had a --

3          THE COURT:  Well, you know, Lucy will have some

4   'splaining to do if you come up with a list of documents they

5   should have identified and they didn't.  Once you've come up

6   with a list of documents, they'll have to explain why they

7   didn't screen them out in their taint process.  That would be

8   part of getting the remedy, right?

9          MR. NIEWOEHNER:  It would be.

10          THE COURT:  Okay.

11          MR. NIEWOEHNER:  Agreed.  And I guess I'm trying to --

12   we have a trial date six months away.  I think, given the

13   pattern that we've shown, that understanding how they treated

14   what they had, which would inform us, would also help us look,

15   quite frankly, if I knew what search terms they used or didn't

16   know -- didn't use.

17          THE COURT:  You don't -- you can't come up with some

18   search terms that you think are relevant to find your own

19   privileged and work product information?  You know the people

20   involved.  You know the issues involved.  You can't come up

21   with that to have your own experts find out from you which of

22   those documents should have been identified as privileged or

23   work product?

24          MR. NIEWOEHNER:  We can and we will.

25          THE COURT:  Okay.

1          MR. NIEWOEHNER:  But the point would be --

2          THE COURT:  And that would be interesting, to know if

3     your process comports with their process, which would tell you

4     whether or not there is some willfulness going on, if your

5     process was obvious and it reveals these things that theirs

6     didn't, to me.

7          MR. NIEWOEHNER:  Agreed.  But I don't know that we

8     have to operate in the dark here.  What --

9          THE COURT:  That's not operating in the dark.  That's

10    --

11         MR. NIEWOEHNER:  On what they did.

12         THE COURT:  -- being proactive because it's your

13    responsibility to make sure that your work product and -- or to

14    bring to the Court's attention if your work product and

15    privilege material has been compromised.

16       I mean, nothing about knowing their process seems to me,

17    based on what you're arguing here, alleviates you of the

18    responsibility of determining which of those documents, if any,

19    were -- in addition to the five that you say -- were provided

20    to the prosecution team by the taint team and they reviewed

21    those things, and seeking some remedial action as a result.

22    Nothing that you have requested changes what will have to

23    happen on your part.

24         MR. NIEWOEHNER:  I hear you on that, but I'll suggest

25    that it will facilitate this process.  That we could

1    independently do everything you just said.

2         THE COURT:  And if you can explain to me how it

3    facilitates that process, that's the part I'm not getting.  And

4    I'm probably not being clear about that, but that's the part

5    I'm not getting, is how does that -- because it sounds like

6    that's two separate things.

7         MR. NIEWOEHNER:  Okay.

8         THE COURT:  How does that facilitate your process?

9         MR. NIEWOEHNER:  In part, just as a technical matter.

10   I'll use one example.  Search terms.  They used a bunch of

11   them.  We independently can come up with our own, agreed.

12        THE COURT:  Because you already claim theirs are

13   inadequate.

14        MR. NIEWOEHNER:  Well, actually, I don't know.  I

15   don't --

16        THE COURT:  So you're not going to use theirs.

17        MR. NIEWOEHNER:  I don't know what they are.  Maybe

18   they're entirely adequate.

19        THE COURT:  Well, but independent of that, you'll

20   determine what they should have done.

21        MR. NIEWOEHNER:  Well, --

22        THE COURT:  This is what you should have done.

23        MR. NIEWOEHNER:  And my point, my only -- my limited

24   point is, agree with you on that, that given the stage of the

25   proceedings, given the burden on them, to simply provide us the

 1   search terms they used will help us (a) craft our own.  We can

 2   do it independently, loud and clear, but we'll know if there's

 3   an issue right off the bat.  And if they -- if their list term

 4   doesn't include chrisniewoehner@steptoe.com, just using me as

 5   an example, and that's an obvious error, we would know to

 6   focus, on our searching, to look for

 7   chrisniewoehner@steptoe.com.  It would assist us to identify

 8   the holes in their production by getting the list of their

 9   search terms.  And at this point in the game, I don't know why

10   we couldn't get that.

11        THE COURT:  Well, you have everything, though, that

12   was taken.  And if your point of getting their search terms is

13   to point out later to the Court how woefully inadequate their

14   taint team process was, you know, it's like hindsight is 20/20.

15   Oh, I would have done it better.  Well, if you do it to begin

16   with, you can show that this was the obvious way it should have

17   been done and it wasn't, as opposed to looking at theirs and

18   grading their work and saying, oh, but you didn't, oh, but you

19   didn't.  You've got the stuff.  You've got the stuff.

20     You've got more information about -- you've got more

21   information than they ever had about who was involved, what was

22   involved, the time frames involved.  So it would seem to me

23   that you could have already looked at that and determined which

24   of those documents were turned over to the prosecution that

25   shouldn't have been.

1          MR. NIEWOEHNER:  All right.  We took a sampling

2     approach to demonstrate the issue to try to identify whether --

3     you know, quite frankly, whether both sides need to spend a

4     huge amount of time on this.

5          THE COURT:  Uh-huh.

6          MR. NIEWOEHNER:  And that's part of the -- look, part

7     of the reason I'm trying to get information, much as I would

8     love to do a privilege review of three million documents,

9     that's a huge imposition on us.

10         THE COURT:  Uh-huh.

11         MR. NIEWOEHNER:  And if we can do things to shortcut

12    it --

13         THE COURT:  So if you have -- if you know what

14    documents the taint team identified, if you know the whole --

15    what 90,000-something -- and I'm probably mixing up the numbers

16    at this point -- documents that were sent to the -- identified

17    through the search term process, of which the taint team

18    specifically reviewed and determined 40,000-something was,

19    47,000 -- or 47,000 wasn't, so if you had that information,

20    this is what ultimately they received from the taint team that

21    potentially or they thought might have some privilege based on

22    the search terms but was later determined not to, would that

23    answer your question?

24         MR. NIEWOEHNER:  It's the end result.

25         THE COURT:  That's what I'm talking about, the end

```
 1   result.
 2            MR. NIEWOEHNER:  Result.
 3            THE COURT:  The end result.
 4            MR. NIEWOEHNER:  Yes.  To figure out what the next
 5   step is, ultimately, we'll have to have some subset of the
 6   world.  We think it will be more graceful, less burdensome on
 7   us, given their errors on the front end, that we should be
 8   given some --
 9            THE COURT:  That's -- that's -- go for it.
10            MR. NIEWOEHNER:  All right.  So I guess what I'm
11   trying to understand, where you're headed.  Just your
12   preference would be that we identify some world of documents we
13   believe are privileged?
14            THE COURT:  I think that's what the law requires of
15   you, to at least say, these are privileged, these are work
16   product, and you've seen them, and so now I need the Court to
17   fashion a remedy for me.
18            MR. NIEWOEHNER:  Okay.  My difficulty will be, you
19   know, because I don't know what Mr. Runkle actually has seen,
20   but we have the world that they didn't screen out, so we will
21   do our best to identify the world that they should have
22   screened.
23            THE COURT:  Exactly.
24            MR. NIEWOEHNER:  And we can -- and then I expect we'll
25   be right back here and then I'll ask for the same --
```

```
 1              THE COURT:  And that's what we get paid for.  Exactly.

 2              MR. NIEWOEHNER:  Then --

 3              THE COURT:  I'm sorry.  I don't mean to cut anybody

 4    else's argument off that wants to add to that, but, you know, I

 5    think -- I don't think you're at the point that you get the

 6    relief that you're requesting until you come back with some

 7    evidence that, or identification, some evidence identifying

 8    what.

 9        And it would be different if they had kept from you your

10    own records that they seized or kept from you the universe of

11    documents that were turned over to the prosecution by the taint

12    team, but it doesn't sound like that's happened here.  It's

13    like you have that information from which you can determine

14    whether or not they've done something untoward.

15              MR. NIEWOEHNER:  Understood, Your Honor.

16        You've obviously seen our briefs on the other things.  What

17    I would do now is to turn to Mr. Linehan.  There were some

18    waiver arguments that were raised that --

19              THE COURT:  Yes.  And they raised them first, so --

20    and I'm, you know, I'm not getting the waiver stuff, so maybe

21    I'll give them an opportunity to explain that a little better

22    to me, because I don't get that.  And then we'll see if it's

23    necessary to respond to it.

24              MR. NIEWOEHNER:  All right.  Thank you, Your Honor.

25              THE COURT:  Okay.
```

1              MR. RUNKLE:  Thank you, Your Honor.

2              THE COURT:  Yes, sir.

3              MR. RUNKLE:  So I will keep -- I have a presentation

4     that will -- I'll keep it to be as brief as possible.  I don't

5     have five stages.  I think I have fewer than that.

6              THE COURT:  And is this something that the people on

7     the other side have?

8              MR. RUNKLE:  No.  I'm giving it to them right now.

9              THE COURT:  Okay.

10             MR. RUNKLE:  It's just an outline of what I'm going to

11    discuss.

12             THE COURT:  Okay.

13             MR. RUNKLE:  Okay.  So the first thing I'd like to do

14    is lift the veil a little bit, again, on some of these obscure

15    arguments that are being made about we don't know, we don't

16    know this, we don't know that.  I can explain why the taint

17    attorney wrote in her affidavit that she didn't know why no one

18    had seen those documents, because we did an investigation to

19    figure out what was happening when they filed those five

20    documents, which were neither in our collection nor apparently

21    in the taint collection.  So we did an investigation to figure

22    that out.

23        Their reply was actually very helpful because it pointed

24    out the specific file path where those files came from.  And it

25    turned out, when we looked -- and this is the Exhibit 1 which

1    we provided to the Court and the Defense yesterday -- this is

2    what I saw.  So Mr. Niewoehner wanted to know what I saw, so

3    I'm going to show him what I saw.  When I went into those file

4    paths, this is what I saw.  And if I could direct Your Honor's

5    attention to the file name, which is ceo.usplabsdirect.com.pst,

6    PST is an Outlook file format that stores a bunch of emails.

7    And if you -- I'd direct Your Honor's attention down to slip

8    sheet reason, not extracted.  So these files, it turned out,

9    the contractor who performed the processing which was going on

10   during the six months that Mr. Niewoehner thinks were missing,

11   the documents were being processed.  There's millions of them.

12   It turned out, and we didn't know this until they filed their

13   motion, that some of the PST files had not been extracted and

14   had taken errors, and the contractor had never let us know that

15   those files had taken errors.

16       So I think that can, even though I understand where Your

17   Honor is going with their motion, I did want to resolve that

18   issue for the Court and for the Defense, because we haven't

19   seen those documents.  The reason that they're not there is

20   because they were not processed, so --

21           THE COURT:  So your explanation for the affiant saying

22   that the reason that she -- there is no explanation for why,

23   she had no explanation for why the taint team didn't receive

24   specific versions, is because you hadn't done the investigation

25   yet and determined why?

1          MR. RUNKLE:  That's correct.  So she had -- it was not

2    immediately apparent to us why we hadn't seen those specific

3    documents because we didn't know -- the Defense had not

4    provided us where they had come from.  Your Honor, the way that

5    documents are collected is through a forensic process, and so

6    the images are extracted and then there are files and then

7    those files are processed.  And so without knowing where a

8    specific file that the Defense had came from, it was very

9    difficult for us to identify where they would have seen

10   documents that we didn't have.  We were able to identify that

11   after we got their file paths, which they filed in their reply.

12   And so that's why I brought it with me today, to provide that

13   answer to the Court and to the Defense.  And it's just a fact

14   of life that sometimes technical errors happen, and they did in

15   this case.

16        So I wanted to -- in my presentation -- I'll move through

17   the first parts very quickly because I think that the Court has

18   already appreciated these points, which is that privilege must

19   be asserted specifically over specific documents.  And the

20   Courts of Appeals have been very clear that a blanket assertion

21   of privilege over that collection as privileged is not adequate

22   to actually assert a privilege.  And so I believe there's a

23   basic failure of proof in this motion on whether any of the

24   documents are privileged.

25          THE COURT:  You know, that's -- and, of course, that's

1    all true.  But in the context of this criminal case, there was

2    a purpose for the taint team.  And so if what you represented

3    by using the taint team process is that you have not reviewed

4    or seen any attorney-client work product information that was

5    seized -- because, of course, they have no control.  Unlike in

6    a civil situation where you ask them for the documents and they

7    get to review them and they get to say, no, I'm not going to

8    produce those to you because they are -- and then we come to

9    Court and we fight about it, you went in and you took them, so

10   they had no recourse at that point for you taking them, no

11   opportunity to review what you were taking.  And so they have

12   to depend on your taint team process to do in a criminal

13   context something they might have been able to do in a civil

14   context to protect their information.

15        So, with that in mind, to make the blanket statement that

16   they have to identify them has to take into consideration the

17   process, that these documents were seized pursuant to warrant

18   as opposed to requested pursuant to subpoena or some other

19   discovery method by which they would have had an opportunity,

20   before the documents were in the hands of the Government, to

21   make a determination.

22        You know, my point, though, was that since then and since

23   you've done the taint team process and since counsel for

24   Defendants do have access and knowledge of what those documents

25   are, that they can very well at this point do what they

1    couldn't at the beginning, and that's identify which one of

2    those that were seized and that you've been provided or have

3    been provided to you as the prosecutor from the taint team you

4    shouldn't have gotten, is the point.

5        So, through the backdoor process, they can do that now, but

6    to say that they were expected to do it before, at the

7    beginning, there's just no way they could, which is why it

8    matters if the taint team process was sufficient.

9        But without some -- we just don't get to decide non-issues

10   here, so there has to be an issue, is the point.  And without

11   some evidence that you've actually -- the taint -- that you've

12   actually gotten some documents you shouldn't have, or been

13   privy to some documents you shouldn't have, there is not a

14   question for the Court to determine or a dispute for the Court

15   to determine or good cause to enter an order for protection,

16   without something else at this point.  That was my point, if

17   that helps you get to --

18           MR. RUNKLE:  Yes, it does, Your Honor.

19           THE COURT:  Okay.

20           MR. RUNKLE:  I agree with much of what you said, and

21   that's why there was a taint process in this case.  It was a

22   very rigorous process.  It consumed a lot of resources.

23       And what I wanted to make absolutely clear that may not

24   have been entirely clear from the discussion with Mr.

25   Niewoehner is that, over a year ago, and I remember because it

1  was when my son was born, and he just turned one, we turned

2  over those 41,000 documents that were privileged or potentially

3  privileged, that the taint team had flagged to the Defense.  So

4  that has already -- they have -- that has been in their

5  possession for a year.

6           THE COURT:  And he acknowledged that.

7           MR. RUNKLE:  That's right.  I just wanted to make sure

8  there was -- near the end of the discussion it was not clear

9  that that was -- that that had actually taken place.  So that

10 was a year ago.  And of course, they've had the broader search

11 warrant collection for a year and a half, I believe.  And so

12 that was all available to them.

13      Now, and they've pointed out these five documents, which we

14 haven't seen, and there are potentially other documents that

15 there would be errors in, and we would be very happy to

16 cooperate in a meet-and-confer.  If they identify documents, we

17 can tell them why either we haven't seen the document or why it

18 hasn't been provided to the prosecution team or why it has been

19 provided to the prosecution team.  We would have been willing

20 to engage in that type of meet-and-confer but we never got to

21 that point because what we got was a motion, you know, about

22 all the misconduct that we -- you know, alleging that we

23 committed all this misconduct, which, you know, we don't

24 believe any of it happened.

25      And so I'll try to skip a lot of the hyperbole, but I'll

 1   just hit the highlights, which is that none of -- there was a

 2   taint process in place during the search warrant executions.

 3   And I know Your Honor might not be very concerned about that,

 4   given where you're headed, but there was a process in place to

 5   put potentially privileged physical material into a box that

 6   was delivered to the U.S. Attorney's Office that was reviewed

 7   by the taint team eventually and it was not reviewed by the

 8   prosecution team.

 9      So that was the process.  And there just were not -- the

10   privileges were not run roughshod over, to use their phrase

11   that was in their motion.  Those factual things did not occur,

12   and I think that we have made a showing on that.

13      I can move on to -- I did want to touch very, very briefly

14   on the allegation that I have colluded with Plaintiff's lawyers

15   in the civil cases in Hawaii.  It's very, very far from the

16   truth, that that has occurred.  Of course, it wouldn't even be

17   relevant to this motion because no privileged material was ever

18   given to those attorneys.  The material was sent and it was

19   approved by the Civil Division's FOIA office to send that hard

20   drive to the District Court in Hawaii for *in camera* review.

21          THE COURT:  How can -- I don't understand, with that

22   being seized in an ongoing criminal case, how it could be

23   subject to FOIA anyway.

24          MR. RUNKLE:  The issue was that there were -- so, it

25   may or may not have been subject to FOIA, but I'm not a FOIA

1   attorney.  We discussed this with the FOIA office and there was

2   a discussion and this was a potential resolution.  And they

3   were very happy to get this FOIA request off of their plate.

4   And that was the way that it worked.

5           THE COURT:  You discussed it with them and this was a

6   resolution?

7           MR. RUNKLE:  Yes.

8           THE COURT:  So you came up with the idea they should

9   get it?

10          MR. RUNKLE:  I don't believe I came up with the idea.

11  I -- the discussion -- I don't remember where the idea

12  originated.  I believe the discussion was along the lines of

13  this is a massive amount of material to review to see if it is

14  privileged, or, I mean, to see if it is FOIA-able, because

15  there are numerous government documents within the search

16  warrant collection because they had been corresponding with the

17  Government.

18      I think there was some concern -- and as I said, I'm not a

19  FOIA attorney -- there was some concern with the idea that

20  potentially the Government's communications with the Defendants

21  would have been FOIA-able from that collection.  I believe

22  there was some concern about that.  But I -- as I said, I'm not

23  a FOIA attorney.

24      And the idea was that the court in Hawaii, if the parties

25  were willing to pay for a special master, I guess, would have

1    been able to sort out the issue.  There was also a very, very

2    serious concern -- that continues to be a concern -- about

3    obstruction of justice and perjury on the part of the

4    Defendants in those cases.

5           THE COURT:  So did you actually send the entire

6    universe of documents seized, then, to Hawaii?

7           MR. RUNKLE:  The search warrant images were sent to

8    Hawaii.

9           THE COURT:  Well, then who -- who then excluded any

10   attorney-client or potentially attorney-client privilege that

11   was produced in that --

12          MR. RUNKLE:  The Court would have.  That was -- the

13   Court -- we didn't send it to the Plaintiff's attorneys.

14          THE COURT:  Right.

15          MR. RUNKLE:  We sent it to the Court for *in camera*

16   review.  That was the entire point.  Because we didn't want to

17   violate their privileges, so we sent it to the Court.  They

18   represented to the Court that they didn't have this material in

19   that case.

20          THE COURT:  How is that in response to a FOIA request?

21          MR. RUNKLE:  Well, there was a FOIA request that once

22   they represented -- I believe the timeline was that once they

23   represented to the Court in Hawaii that there was no -- that

24   they didn't have this material, then the Plaintiff sent a very,

25   very long and very detailed FOIA request to the Civil Division,

1    which is the division where I work, and that generated this

2    whole process.

3         I understand that, in retrospect, maybe it -- I -- in

4    retrospect, what we should have done would have been to send

5    the materials to the Defense, which of course we did a few

6    months later.  So there was -- I mean, it's hard to understand

7    how there's any prejudice for this, because the Court sent the

8    documents back to us.

9              THE COURT:  Uh-huh.

10             MR. RUNKLE:  And so it really isn't germane even to

11   the topic of the motion.  But I did want to go into some of the

12   waiver issues.  And --

13             THE COURT:  And I want you to.

14             MR. RUNKLE:  You would like me to?

15             THE COURT:  That's what --

16             MR. RUNKLE:  Great.

17             THE COURT:  It was in my to do.

18             MR. RUNKLE:  Okay.  Let's go.  So let's go to that.

19   That, so there are five different privilege waivers on the

20   table in this case.  And I can tell that the Court is not

21   necessarily inclined to go this direction, and so I will keep

22   it --

23             THE COURT:  But I'm listening.

24             MR. RUNKLE:  I will keep it -- I will keep it --

25             THE COURT:  Because maybe there was something in the

 1   written materials that I just didn't look at.

 2          MR. RUNKLE:  Well, I will keep it very brief.  The --

 3   I think -- I'll give a general statement first.  I have five

 4   different privilege waivers here.  I'll deal with the second

 5   one first.  There is an advice of counsel defense in the ether

 6   in this case.  It is very obvious that there is.  It has been

 7   discussed informally with us.  I do not want to put words in my

 8   friends across the aisle's mouths, but it has been discussed

 9   with us.  We believe that it will eventually be asserted and

10   that eventually there will be no privilege over this material.

11   They have said that they haven't decided --

12          THE COURT:  So eventually they might waive their

13   privilege, but right now they haven't?

14          MR. RUNKLE:  Well, no, that's not -- that's not my

15   point.  I'm telling you that generally that is a topic that --

16   that relates more to the protective order motion than it does

17   to the waiver argument, but I believe that there is that

18   defense and it will be asserted formally before Judge Lindsay

19   in some fashion.

20      And so that also makes the protective order motion, in my

21   mind, extraordinarily premature, if you're going to eventually

22   waive privilege over these materials.  So, there's that.

23      The --

24          THE COURT:  And, you know, they could present that

25   defense without turning over every communication they had with

1   their attorneys.

2           MR. RUNKLE:  That's absolutely true.  And we've been

3   --

4           THE COURT:  Legal advice.

5           MR. RUNKLE:  That's absolutely true.  And I believe

6   that we've been investigating.  There is some case law where

7   we're going to ask Judge Lindsay to set a certain date or a

8   certain procedure for how they will assert the privilege so

9   that it doesn't make the trial have to stop in the middle where

10  we have the fight about what the scope of the privilege waiver

11  is.  And I think there's some case law for that.  So that, I

12  just wanted to put that out there, that that's -- that's the

13  strong belief of us, and I'm not putting words in their mouths

14  but I believe that that will happen.

15      So, on to the privilege waivers that we've already talked

16  -- that I've briefed already.  The Hebert letter to the

17  Government asserting that there was an advice of counsel

18  defense that should be presented to the grand jury, I certainly

19  understand the Defense's argument that it seems like a casual

20  invocation of it instead of a formal one that would actually

21  waive privilege.  However, there's a big distinction between

22  the cases that they cite and the conduct that actually occurred

23  here, because the distinction is -- the distinction lies with

24  the grand jury.

25      So, asking the Government to go into the grand jury and

1  tell the grand jury, hey, they say they have an advice of

2  counsel defense, it seems to me that that can constitute a

3  waiver, because the grand jury is entitled to investigate that

4  defense.  And that's the difference between what their -- their

5  cases and this factual scenario.

6  　　　　　THE COURT:  This?  Is that something we should take

7  up?  Because --

8  　　　　　MR. RUNKLE:  Is there anyone not associated with the

9  case in the courtroom?

10  　　　　　THE COURT:  No.

11  　　　　　MR. RUNKLE:  I mean, maybe we should have a discussion

12  about that.

13  　　　　　THE COURT:  No.

14  　　　　　MR. RUNKLE:  We can have a discussion about it.

15  　　　　　THE COURT:  Well, I --

16  　　　　　MR. RUNKLE:  I would like to have that discussion,

17  because the answer -- there is an interesting answer to that

18  question.

19  　　　　　THE COURT:  Uh-huh.

20  　　　　　MR. RUNKLE:  And the answer is that the Defendants --

21  their employees who testified in front of the grand jury

22  repeatedly attempted to invoke the corporation's advice of

23  counsel defense.  And we told them on numerous occasions to

24  stop talking about it.  And so they repeatedly tried to do

25  that.

1          Now, I don't know who told them to say that.  I don't want

2    to cast aspersions.  But it seems hard for me to believe that

3    when I start asking questions to the Defendant's employees that

4    the first thing that comes to mind is Peter Hutt from Covington

5    & Burling told them to do that.  I just find that very

6    difficult to believe.  So I believe that there was a concerted

7    effort to present an advice of counsel defense to the grand

8    jury.

9          THE COURT:  It just seems like just at this point

10   that's a premature issue.

11          MR. RUNKLE:  Uh-huh.

12          THE COURT:  To me.

13          MR. RUNKLE:  Well, it --

14          THE COURT:  Because -- it just seems that way to me.

15          MR. RUNKLE:  It is not a full, you know, it's not a

16   full waiver.

17          THE COURT:  Right.

18          MR. RUNKLE:  It's not the way you would expect it to

19   come.

20          THE COURT:  Right.

21          MR. RUNKLE:  But I do want the Court to consider the

22   concept of what is the Government supposed to do when it gets a

23   letter like this.

24          THE COURT:  Well, I don't think --

25          MR. RUNKLE:  Because either -- or, I'm sorry.

1          THE COURT:  I don't think you go, aha, that every

2     communication that I have in my possession between you and your

3     attorney is now subject to, which is the point.

4          MR. RUNKLE:  Right.  Well, I didn't do that.

5          THE COURT:  Right.

6          MR. RUNKLE:  Right?

7          THE COURT:  So that's the point.  So what else do we

8     need as far as the protective order and waiver?

9          MR. RUNKLE:  Okay.  There is the -- I think there is a

10    waiver by inaction point that I wanted to bring up here, at the

11    very least to -- and I want to make two distinctions here.  One

12    is --

13         THE COURT:  Well, there is some time that you hope,

14    you know, that in the year and a half, or the year, based on

15    your son's birthday, that you would think that they would have

16    had time to go through and look and actually specify which of

17    the documents they contend are privileged or amount to work

18    product.  Still, with all that's going on here, I don't see

19    that you can make the leap to say that they then intend to

20    waive because they've been inactive.

21         MR. RUNKLE:  Well, I want to focus Your Honor's

22    attention on the period prior to that.

23         THE COURT:  Okay.

24         MR. RUNKLE:  So there's two years between the search

25    and the indictment.

1          THE COURT:  Uh-huh.

2          MR. RUNKLE:  Two years.  And their --

3          THE COURT:  And did you give them their stuff back at

4    the beginning of the two years?

5          MR. RUNKLE:  They got their stuff back on the day that

6    the search warrant was executed.

7          THE COURT:  Okay.

8          MR. RUNKLE:  The computers --

9          THE COURT:  I thought you told me that was a year and

10   a half.

11          MR. RUNKLE:  No, that was -- we reproduced it out of

12   an abundance of caution.  So we gave them -- their computers

13   were imaged, I think with the exception of one hard drive that

14   would not image properly, but their computers, the vast

15   majority, and I am talking about the vast majority of the

16   material, was imaged and given back to them, you know,

17   contemporaneously with the search.  If not the same day, two or

18   three days later.  That's my understanding of it.

19      And so the -- that period, to me, evokes some sort of

20   waiver -- and this is why I wanted to make the distinction --

21   not necessarily as to every document in the collection but as

22   to the tainting procedure which they now admit that they knew

23   was going on at the time, there was not a letter, there was not

24   a motion under Rule 40 -- is that 1 or 2 -- 42, I believe.

25   There was not a motion under Rule 42 to return the property

1   during that two-year-long period.  There was never a mention of

2   it in anything.

3       And so to come here after you get indicted and try to get

4   discovery into what Mr. Runkle has seen because there was a

5   tainting procedure that you knew was going on, well, you know,

6   that's a trap that everyone would fall into.

7       And I think that some of the other arguments reveal that

8   that's where this is really headed, is that their arguments

9   could be made in any case involving any defendant who's

10  represented by any attorney, that, you know, they took our

11  stuff, and, you know, we waited, and then we got indicted, and

12  now, you know, we get discovery into Government misconduct.

13  And I just don't think that that's --

14          THE COURT:  Well, it wouldn't have mattered if you

15  hadn't indicted them.

16          MR. RUNKLE:  That is a very good point, Your Honor.

17      So there's one additional waiver point that I wanted to

18  bring up, and this is one that is under seal.  This is another

19  grand jury matter that's under seal before Judge Fitzwater.

20  And I just wanted to make this point.  This was something that

21  I want to make a point for the record and also for the future

22  when we go back.  Apparently, we may go through this process

23  again, from what I hear from Mr. Niewoehner.

24      So, before Judge Fitzwater, Judge Fitzwater ruled that Cy

25  Willson, who's one of the Defendants, is not covered by the

 1    Defendants' privilege, and we got over 3,000 documents that

 2    they had -- that involved attorneys that had been sent to Cy

 3    Willson.  Since this happened -- and this is in a footnote in

 4    my response, and I think it will become very -- more important

 5    in the future, which is why I wanted to put it on the record

 6    today -- is that because Mr. Willson -- these were given to Mr.

 7    Willson not in the context of a litigation, Rule 502 doesn't

 8    apply, and we're in the pre-502 world of subject matter waiver.

 9    And so every communication that was sent to Mr. Willson, given

10    Judge Fitzwater's ruling, acts as a subject matter waiver over

11    that subject matter of the attorney advice.

12         And so when -- and I just want to caution the Court, and I

13    understand where you're headed with the current motion, but in

14    terms of the protective order motion, that significantly

15    recasts the kind of relief that they are seeking, because if

16    they assert that a certain document is privileged -- in fact,

17    in their reply, they assert privilege over responding to FDA

18    warning letters regarding the November 2013 liver injury

19    outbreak that their products caused.  And when they say that

20    that's privileged and that's one of the things that we

21    violated, in fact, they emailed Cy Willson, you know, dozens of

22    times about their draft responses to those warning letters,

23    including the attorney advice that was made on those things.

24         And so I just wanted to put that on the record, that there

25    will have to be a fulsome discussion of the subject matter

1    waivers that happened with respect to Mr. Willson.

2        So, if there's nothing further, Your Honor.

3            THE COURT:  No.

4            MR. RUNKLE:  Thank you.

5            MR. LINEHAN:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. LINEHAN:  Pat Linehan on behalf of USPLabs.

8        I'm going to try and keep this brief.  My sense is that you

9    believe this waiver issue is premature, and I don't want to

10   waste the Court's time.  I do want to address a few of the

11   issues that Mr. Runkle raised.

12       You know, for all of Mr. Runkle's speculation as to what

13   the Defendants will be doing vis-à-vis an advice of counsel

14   defense, we are six months away from trial.  We have not made

15   any such determination, and we don't have to.  So I don't think

16   that should be a relevant part of any analysis as to whether

17   there's been waiver here.

18       I would like to address the Shiphandler letter and some of

19   the things that Mr. Runkle said regarding that letter.  I don't

20   think the letter was asking -- I think he's mischaracterized

21   the comment that Mr. -- Mr. Shiphandler's letter.  If you look

22   at the letter, he's asking for information.  He has no idea

23   what the allegations are.  He's asking for basic facts from the

24   Government.  And he mentions, look, those basic facts would be

25   helpful in order for me on behalf of Mr. Hebert to understand

1   whether or not we should be considering an advice of counsel

2   defense.  It's not a formal assertion of an advice of counsel

3   defense.

4      Now, Mr. Runkle references the grand jury testimony.  I

5   will say that testimony that was taken after Mr. Shiphandler's

6   letter reflects questioning that, to Mr. Runkle's credit,

7   attempts to avoid the disclosure of specific confidences.

8   There are, if I can -- Mr. -- for example, and I don't know if

9   we need to do anything now.  I'm about to quote from some grand

10  jury testimony.

11          THE COURT:  It's not filed under seal, is it?  Is that

12  what you're talking about?

13          MR. LINEHAN:  No, no.  Well, I'll just go ahead.

14          THE COURT:  Okay.

15          MR. LINEHAN:  What happens in the grand jury testimony

16  questioning of one of USPLabs employees, Mr. Schwinghammer, Mr.

17  Sullivan asks, "And you've mentioned legal counsel several

18  times."  He says, "And I don't want to know, if you've had a

19  conversation, what words were exchanged in that conversation,

20  but have you ever spoken to USPLabs' legal counsel, Peter

21  Hutt?"  Answer, "Yes."  Which is how Mr. Schwinghammer would

22  know that Peter Hutt was involved with discussions with the

23  company.

24      This is not -- and I raise that because Mr. Runkle seems to

25  suggest that that answer was somehow fed to him.  Mr.

1    Schwinghammer clearly had personal knowledge of Mr. Hutt's

2    involvement.

3         Continuing with the testimony, the question is, "You have

4    spoken to him?"  Answer, "Yes."  Mr. Runkle, "So let's talk

5    about other things."  So they're clearly moving away from

6    asking confidences.  And I think this reflects the Government's

7    understanding that Mr. Shiphandler did not waive privilege

8    here.  They are continuing to avoid getting -- disclosing or

9    having a witness disclose privileged communications on behalf

10   of the company.

11        I would say the -- two more things.  I would say that I

12   think we need to understand the distinction between a general

13   waiver and any specific waiver of objection to the taint

14   process.  It was a -- the company certainly alerted the

15   Government about a week after the search warrant was executed

16   that there were privileged documents among the seized

17   materials.  And the AUSA assured USPLabs that there was a taint

18   process in place.

19        Once we saw evidence that there may have been a problem

20   with the taint process, we raised the issue.  We talked to the

21   Government in January.  We put our concerns in a formal letter

22   in February.  We got an answer four months later.  So I'm not

23   sure this is a case of inaction even with respect to

24   challenging the taint protocol.

25        The last point I would make is that with respect to Cy

1  Willson -- and I appreciate Mr. Runkle I guess putting the

2  placeholder as opposed to arguing it in a full-throttle way --

3  that issue has not been briefed before the Court.  I would say

4  that, you know, to the extent that there were attorney-client

5  communications disclosed to Mr. Cy Willson, it was certainly

6  with the intent that they would remain privileged and with a

7  state of mind that Mr. Willson was part of the privilege group.

8       So, with that, thank you, Your Honor.

9       THE COURT:  Thank you.  So, regarding the relief

10  requested in the cross-motion for -- the Government's cross-

11  motion, Document #143, that is denied, denied as premature.  If

12  there are -- if there is some further -- or, if there is some

13  actual defense raised of legal advice, acting pursuant to legal

14  advice, then, you know, it'd be appropriate to raise it at that

15  time.

16     I'm not going to go through each of the different reasons

17  that waiver was alleged in this case, but I don't find any of

18  them compelling based on the record that is before the Court at

19  this point, and so the motion is denied.  And I'll ask counsel

20  for USPLabs to give -- to submit an order denying that.  It

21  doesn't have to be -- go into a lot of detail, but just based

22  on, you know, what was basically stated here at the hearing

23  today.

24     And then let me go back and say, as to the motion for

25  protective order, the Defendant's motion for protective order,

1   I'm denying that as premature at this point too, based on the

2   fact that -- including what I've discussed here, but in

3   particular, that the Defendants have failed to identify any

4   privileged or work product materials -- or potentially, even --

5   that were provided to the prosecution team or the prosecution

6   team actually accessed in this case.

7       I think the five documents that you identified point up

8   basically what I contend, is that when you do specifically

9   identify those documents that shouldn't have been revealed and

10  were protected, then it not only gives an opportunity to

11  determine why and perhaps for the Court to take some action to

12  give you some remedy.  And so that's why, I think, that without

13  -- that you've failed in your burden to show good cause for the

14  issuance of a protective order.

15      And like I said, the things that you seek in addition to a

16  protective order -- specifically, that the Government be

17  required to provide you additional information -- I don't think

18  you've shown -- made a showing that there is good cause for

19  that either at this point, under either Rule 16 or the Court's

20  inherent power as it stands.

21      So, now let's go to the USP -- the motion to quash of the

22  Defendants of the subpoena, the grand jury subpoenas issued to

23  USPLabs.

24          MR. LINEHAN:  Thank you, Your Honor.  Hello again.

25          THE COURT:  Yes, sir.

1              MR. LINEHAN:  Just for the record, it's Pat Linehan on

2    behalf of USPLabs.

3         Your Honor, the grand jury subpoena at issue in the motion

4    to quash was served in September 2016, which is close to one

5    year after the original filing of the indictment and over three

6    years after the Government executed its search warrants in

7    November 2013.  The subpoena seeks documents relating to three

8    specifically-named entities -- PES, Muscle Management, and

9    Royalty Offshore -- and an individual named Josh Pool.  None of

10   these entities had any corporate connection to USPLabs, and

11   Josh Pool is neither an employee or owner of USPLabs.

12        Furthermore, the subpoena also requests that -- it requests

13   "any records relating to any other business entity owned or

14   controlled, in whole or in part," not only by USPLabs but any

15   of its principals.  In other words, it seeks documents relating

16   to any of the principals' personal business dealings outside of

17   USPLabs.

18        We've moved to quash this subpoena on three grounds.

19   Number one, it's an improper post-indictment use of the grand

20   jury.  Two, it's an unduly and burdensome -- unduly burdensome

21   and oppressive measure that distracts from the company's trial

22   preparation efforts.  And number three, by seeking documents

23   that are personal to USPLabs' owners and unrelated to the

24   business of USPLabs, it's an improper attempt to subvert the

25   owner-defendants' personally-held Fifth Amendment rights under

1    *U.S. v. Fisher.*

2      I'd like to go to the post-indictment issue first.  It's

3 well-settled, Your Honor, that the Government cannot use the

4 grand jury post-indictment to obtain pretrial discovery or to

5 continue its investigations into the allegations that are in

6 the indictment.

7      THE COURT:  Of course, they don't contest that.  They

8 simply say that, you know, we're investigating other wrongs,

9 which they can do even if it involves the same defendants.

10 Wouldn't you agree?

11      MR. LINEHAN:  Well, I think that -- I think that

12 that's their argument.  I think it's a pretextual one.  I think

13 what's going on here is that they're seeking 404(b) evidence.

14      THE COURT:  And I understood that that's what you --

15 your position was, but I was hoping that at this hearing you

16 could give me some evidence that supports your position.

17      MR. LINEHAN:  Sure.  Okay.  Well, let me address the

18 -- because I think they make two arguments here.  One is that

19 they're investigating post-indictment conduct, and the other

20 one is that they're investigating something that's unrelated to

21 the indictment.  I'd like to think --

22      THE COURT:  Or is related to another uncharged entity.

23      MR. LINEHAN:  That's right.  So let -- I'd like to

24 address that argument first.

25      You know, the indictment, while it may not mention PES or

1   any of these other entities, it does charge the Defendants with

2   -- certain of the Defendants with money laundering.  And under

3   that money laundering charge, they allege that the USPLabs

4   Defendants "moved assets through seemingly unrelated shell

5   business entities and concealed the source and nature of the

6   proceeds derived."

7       I would submit that this issue has been investigated and

8   has already -- and the Government has proceeded to indict based

9   on the investigation.  I think that this is just -- this is

10  just a -- not an attempt to investigate something -- to the

11  extent this issue is being investigated, it's already been

12  investigated, and I think that if this is looking at uncharged

13  allegations, I think the allegations are -- have already been

14  charged in the current indictment.

15      I don't think it matters that PES or any of the other

16  entities have not been specifically identified in the

17  indictment.  The indictment was very general.  It talks about

18  seemingly-unrelated shell business entities.

19      And it's also not as if PES was some unknown entity as of

20  late 2016, because there are PES documents in what the

21  Government has already seized.  They knew about PES and they

22  could have, you know, they could have pursued an investigation

23  on PES and these other entities, and they did not prior to

24  indictment, or they did and they've come to the conclusion that

25  Count 10 is an adequate manifestation of their investigation.

1          THE COURT:  That they could have?  Does that preclude

2   them investigating it, though?

3          MR. LINEHAN:  Well, I don't think there's an

4   investigation of uncharged allegations here.  I think this is a

5   further investigation of a charged allegation.

6          THE COURT:  A charged allegation against an uncharged

7   defendant though, right?

8          MR. LINEHAN:  Meaning PES?

9          THE COURT:  Right.

10         MR. LINEHAN:  I'm not aware of who the target of the

11  investigation is, but I know with respect to USPLabs this was

12  clearly an investigation, the product of which were the

13  allegations in Count -- I'm sorry.  I said Count 10.  I believe

14  it's Count 11.

15      As to the other argument with respect to whether it's a

16  legitimate investigation of post-indictment conduct, you know,

17  I think -- I'd like to just fill the Court in with some factual

18  context here, which is USPLabs was never corporately affiliated

19  with PES or any of the other entities named in the indictment.

20  And with respect to the individual owners, Mr. Doyle and Mr.

21  Hebert relinquished their interest in PES in November 2013, and

22  Mr. Geissler was a passive investor, only a passive investor in

23  PES, had no controlling interest and did not control the

24  operations of that entity.

25      So, you know, that's our factual proffer here.  I don't

1  think that there is anything --

2       THE COURT:  Well, I don't know how that precludes them

3  from investigating, though.  I mean, they have broad grand jury

4  investigative powers.  And the fact that, you know, you believe

5  that they're not going to find anything or have anything to

6  indict doesn't preclude them from actually investigating.

7       MR. LINEHAN:  Right.  And I think I would plainly

8  agree with that in a pre-indictment context.

9       THE COURT:  How does that change, though, in a post-

10  indictment context?

11       MR. LINEHAN:  Because I think there is the possibility

12  or there is the potential for abuse of the grand jury power

13  when the Government has already indicted a Defendant and

14  continues to use the grand jury to investigate charges --

15  investigate facts that, by the face of the indictment, have

16  already been investigated.  You know, I think --

17       THE COURT:  Have they submitted a subpoena to USPLabs

18  for the same -- the same *duces tecum* for the same information

19  before this?

20       MR. LINEHAN:  No.

21       THE COURT:  Is there another subpoena --

22       MR. LINEHAN:  No.

23       THE COURT:  -- that's been out there?  Because you

24  were talking abuses like --

25       MR. LINEHAN:  No.  There's no USP --

1           THE COURT:  -- this is something that's ongoing and

2   they've been doing it, they've been doing it, and --

3           MR. LINEHAN:  There's --

4           THE COURT:  But it's this one instance, right?

5           MR. LINEHAN:  No.  Well, they wouldn't need to

6   subpoena anything from USPLabs because as of November 13th they

7   had everything that USPLabs had, at least electronically.

8           THE COURT:  But that's who the subpoena is issued to.

9           MR. LINEHAN:  That's right.  I'm not -- I'm sorry,

10  Your Honor.  Maybe I'm misunderstanding your question.

11          THE COURT:  Okay.  What -- we're talking about the

12  motion to quash the subpoena to USPLabs.

13          MR. LINEHAN:  Right.

14          THE COURT:  Okay.  And you're saying that they are --

15  they could potentially be abusing the grand jury process.

16          MR. LINEHAN:  Correct.

17          THE COURT:  Okay.  And so I'm asking you, are there

18  other instances of them requesting information from USPLabs

19  pursuant to grand jury investigation and subpoena power that

20  would make you think that, or are we only talking about this

21  particular subpoena?

22          MR. LINEHAN:  We're only talking about this particular

23  subpoena.

24          THE COURT:  Okay.  I'm sorry I wasn't saying it --

25          MR. LINEHAN:  I'm sorry I was not clear about that.

```
 1              THE COURT:  I wasn't clear on what I had said.

 2              MR. LINEHAN:  So, and the other aspect of the subpoena

 3    that suggests that this is not an investigation of an uncharged

 4    defendant such as PES is the breadth of the third request.  And

 5    if you look at the third request -- let me get the language

 6    here.  The third request -- and I think I've already quoted the

 7    language -- but it's any records related to any other business

 8    entity owned or controlled in whole or in part by USPLabs

 9    and/or any of its principals.  And, you know, I think, separate

10    and apart from this being a post-indictment use of the grand

11    jury, I think independently this is the very type of fishing

12    expedition that the Supreme Court warned against in R.

13    Enterprises (phonetic).  And I think, at least with respect to

14    the third request, you know, that would be -- that's an -- it's

15    an overbroad request that's just searching for what we believe

16    is 404(b) evidence that they intend to use at trial.

17         I mean, this -- the other argument, which is sort of

18    separate and apart from the timing of the grand jury with

19    respect to the indictment, is the fact that we are now six

20    months away from trial.  And I know this has obviously been

21    several months pending, but, you know, we're significantly into

22    the trial prep process, and this subpoena is going to require

23    USPLabs to take resources, time and resources away where it

24    should be preparing for trial and have to respond to the

25    subpoena.
```

1      We're right now in the middle of a massive *Daubert* motions

2  practice which has resulted in thousands of pages of documents

3  to review.  We've got a three-million-document database.  We've

4  got pretrial motions.  And, you know, with six months left --

5  and we've got -- and a January 28th deadline, I think this has

6  been and continues to be a threat of an undue burden on the

7  company, on a company that --

8           THE COURT:  You know, it's always going to be

9  inconvenient, for sure, but to prove that it's unduly

10  burdensome, you know, the courts usually require something more

11  specific.  You know, affidavits that talk about what it's going

12  to take to find the information, you know, what it's going to

13  cost, man hours, woman hours, things like that.

14           MR. LINEHAN:  Well, if Your Honor would indulge, we

15  could provide that.  We don't have that --

16           THE COURT:  Well, you should have already provided

17  that --

18           MR. LINEHAN:  We don't have that here.

19           THE COURT:  -- because this has been -- you filed this

20  back in --

21           MR. LINEHAN:  Fair enough.

22           THE COURT:  No.

23           MR. LINEHAN:  I do think that, to some extent, that

24  there is a -- it's self-evident --

25           THE COURT:  So that's why we're here.

1          MR. LINEHAN:  It's self-evident that a three-million-

2     document database and an 11-count indictment is going to expend

3     a lot of the company's resources in a way that may be

4     distracting.

5          THE COURT:  Well, that is, but that's not the

6     question.  The question is whether we're complying with the

7     subpoena.

8          MR. LINEHAN:  Right.  So, but my point is I guess, you

9     know, absent actual affidavit evidence, I think that we could

10    -- I think it's fair to say that a company who's facing 11

11    counts -- an 11- count indictment with a three-million-document

12    universe of, you know, record to deal with, and 12 -- you know,

13    20 to 25 experts, I think at this point it presents a threat to

14    and an undue burden.  Particularly -- and I think you have to

15    sort of look at the context, which is, you know, which is the

16    other arguments, which is this is a post-indictment subpoena

17    which I think is -- you know, which we believe is a pretextual

18    attempt to get 404(b) evidence.

19      If I can move to the Fifth Amendment issue.  I don't think

20    it's a stretch.  I think it's well-settled that we've got --

21    that the individual defendants would have an act of production

22    Fifth Amendment right under *U.S. v. Fisher.*

23          THE COURT:  But the individual defendants aren't

24    subpoenaed.

25          MR. LINEHAN:  That's correct, but they're going to be

1   custodians --

2            THE COURT:  So that's --

3            MR. LINEHAN:  But they're going to be custodians of --

4   and --

5            THE COURT:  That's what happens when you have a

6   company.

7            MR. LINEHAN:  Well, if you -- if the -- the case law

8   makes a distinction between U.S. -- between corporate business

9   records for -- business records for which the corporation is a

10  custodian and personal records.  If you look at the cases that

11  we cite, --

12           THE COURT:  But it didn't look like they subpoenaed

13  any personal records of a defendant.  It looks like they --

14           MR. LINEHAN:  But they are -- this is a --

15           THE COURT:  -- subpoenaed records of the corporation.

16           MR. LINEHAN:  It's a three-person LLC, and these guys

17  did a lot of personal business on their USPLabs servers.  I

18  mean, this is not a Fourth Amendment issue where the question

19  would be whether or not they have a reasonable expectation of

20  privacy.  This is a Fifth Amendment issue.  And the fact that

21  -- the fact is they're going to be producing personal records

22  that they have a right not to produce.

23           THE COURT:  Are they personal records responsive to

24  the subpoena?

25           MR. LINEHAN:  Yeah, for a number -- for the third --

1    the third request requires records relating to any business

2    entities controlled or owned by any of the principals.  So it's

3    requiring personal records.  And by having to produce these

4    records, the personal -- the individual owners have a Fifth

5    Amendment right at stake here.

6        You know, it's -- we could certainly segregate -- we could

7    certainly separate the universe of personal documents and

8    USPLabs documents.  And if the Government is so inclined, not

9    -- I mean, I'm sorry, if the Court is so inclined not to buy my

10   first two arguments, at the very least we can segregate out the

11   personal documents which implicate the Fifth Amendment issue

12   and produce anything that relates to USPLabs' business.  I

13   don't think there's going to be a lot in there, based on the

14   factual proffer that we've given you.

15           THE COURT:  Okay.  I'm having trouble understanding

16   the distinctions here.  Okay.  The subpoena is for USPLabs'

17   records, not the individual defendants' records.

18           MR. LINEHAN:  If I could stop you there to make a

19   clarification.

20           THE COURT:  Okay.

21           MR. LINEHAN:  The subpoena is for USPLabs' records and

22   personal records that happen to be in the possession, custody,

23   and control of USPLabs.

24           THE COURT:  Okay.  I overlooked that.

25           MR. LINEHAN:  So it's --

1          THE COURT:  It said "and personal records"?

2          MR. LINEHAN:  Well, if you look at -- if you look at

3     the third request, the third request asks for any records

4     related to any other business entity owned or controlled in

5     whole or in part by USPLabs or any of its principals.  So the

6     Fifth Amendment wouldn't be implicated by USPLabs' business

7     records.  What I'm saying is that there are personal records in

8     --

9          THE COURT:  So the Fifth Amendment privilege would be

10    implicated by having to turn over records that identify any

11    other businesses other --

12         MR. LINEHAN:  Any other business entities involving

13    the principals to the company, not the company itself.  That --

14    any person --

15         THE COURT:  That in and of itself would -- could

16    potentially be incriminating.

17         MR. LINEHAN:  The act of that production, because the

18    individual owners will be the effective custodians of the

19    production.

20         THE COURT:  Is it just simply because it involves

21    them?  Because it seems like the subject matter of it doesn't

22    tend to suggest anything incriminating.

23         MR. LINEHAN:  Well, I'm not here to tell you why any

24    particular document that may be in the possession is or is not

25    incriminating, but --

1          THE COURT:  And I don't want you to tell me why it's

2     incriminating, but I'm just trying to wrap my own mind around

3     how, you know, how this even implicates a Fifth Amendment

4     privilege.

5          MR. LINEHAN:  Well, under --

6          THE COURT:  This request.

7          MR. LINEHAN:  Sure.  So, under *United States v.*

8     *Fisher,* the act of production of a certain document could

9     theoretically be used as a point in the chain of custody or for

10    some other knowledge of the document, or there's a variety of

11    different ways in which the act of production can be a

12    testimonial act.  And that's *U.S. v. Fisher.*  There's no

13    question about that.  That's why these guys weren't subpoenaed

14    personally.

15         THE COURT:  But it's the act of production of the

16    subpoenaed entity and it's -- and the individuals acting as

17    custodians.

18         MR. LINEHAN:  That's right.  So the collective entity

19    exception to the act of production doctrine.

20         THE COURT:  Right.  So talk about that.

21         MR. LINEHAN:  Sure.

22         THE COURT:  Because they make a compelling argument

23    that you -- that we don't have that here.

24         MR. LINEHAN:  Right.  So the collective entity

25    exception to the act of production argument excludes -- from

1   *Fisher,* excludes from the act of production the production of

2   documents by a corporate custodian.  That custodian cannot

3   assert a Fifth Amendment privilege because he's acting in his

4   representative capacity.

5           THE COURT:  Right.

6           MR. LINEHAN:  Okay?  So he is producing documents on

7   behalf of the company.

8           THE COURT:  Right.

9           MR. LINEHAN:  He doesn't have a Fifth --

10          THE COURT:  Right.

11          MR. LINEHAN:  And the case law is clear that that is

12  with respect to that person's representative capacity and with

13  respect to business -- that company's business records.

14          THE COURT:  Uh-huh.

15          MR. LINEHAN:  What this subpoena asks for is not only

16  USPLabs' records but personal records of the individual owners,

17  in this case who will effectively be the custodians.

18          THE COURT:  Well, but it calls them principals.  Do

19  you think that makes a distinction?  They're the principals of

20  USPLabs.

21          MR. LINEHAN:  Well, there are three principals of USP

22  who are the three defendants here.

23          THE COURT:  Uh-huh.

24          MR. LINEHAN:  And that's -- and that captures personal

25  documents that are --

 1          THE COURT:  How does that make them personal, though?

 2          MR. LINEHAN:  Because these are personal.  If they are

 3   dealing with entities, they're not dealing with them as

 4   entities of their -- of USPLabs.  These are personal

 5   investments that they're making.

 6          THE COURT:  Okay.

 7          MR. LINEHAN:  So I think, you know, the Government

 8   makes this argument that the -- that there's -- you know,

 9   they're trying to be an alter ego to the LLC, and that's really

10   not the point.  The point is these personal documents are

11   different.  It's a different ballgame when it's personal

12   documents and the custodian under a *Fisher* analysis is

13   producing documents that are personal to him.

14          THE COURT:  Uh-huh.

15          MR. LINEHAN:  So, with that, I --

16          THE COURT:  Okay.  So I guess the distinction is that

17   by personal you don't mean personal so much as not related to

18   USP?

19          MR. LINEHAN:  Correct.

20          THE COURT:  Okay.

21          MR. LINEHAN:  Not personal like I'm talking to my wife

22   or my kids.

23          THE COURT:  Right.  Right.

24          MR. LINEHAN:  Right.  Thank you, Your Honor.

25          MR. RUNKLE:  Thank you, Your Honor.  I'll try to be as

1  brief as possible.

2      I think the -- I'll take the last point first, which was

3  the Fifth Amendment argument.  I don't really understand the

4  argument because they are a collective entity.  This was the --

5  this is what happens when you form a company.  And an LLC is

6  not -- is not actually --

7          THE COURT:  I think the last argument, though, was

8  focusing on the actual request, the third request, though, --

9          MR. RUNKLE:  Right.

10          THE COURT:  -- and the information sought.

11          MR. RUNKLE:  And I think, Your Honor, Your Honor

12  construed it correctly in that it asked for documents that are

13  in the possession of USPLabs, the corporate entity.  And so if

14  the documents are in the possession of USPLabs, the corporate

15  entity, the entity may produce them to us.

16      If the documents are truly personal documents that are not

17  in the possession of USPLabs, the corporate entity, then

18  they're not covered by the subpoena.

19          THE COURT:  Okay.  Well, what about the fact that

20  turning them over as custodians of USPLabs, they would

21  basically be admitting that these are the things?

22          MR. RUNKLE:  Right.

23          THE COURT:  That these are the --

24          MR. RUNKLE:  Well, I think that's inherent in the

25  collective entity rule.

1          THE COURT:  Uh-huh.

2          MR. RUNKLE:  That's -- that's --

3          THE COURT:  But when it comes to those specific --

4   that specific subportion of the request, though, --

5          MR. RUNKLE:  Uh-huh.

6          THE COURT:  -- asking USPLabs for information

7   regarding the principals' participation in other businesses, --

8          MR. RUNKLE:  Right.  And what protects them from that

9   is that if they were truly personal documents that they didn't

10  comingle with their work for USPLabs, then they're not --

11         THE COURT:  Now, is there some law that talks about

12  them being comingled, though?  Because I don't see that cited

13  anywhere.

14         MR. RUNKLE:  There is not a law about it being --

15         THE COURT:  That something about them waives the fact

16  that -- I don't know if waiver is a good word -- that they

17  would otherwise be not --

18         MR. RUNKLE:  Well, that's the possession, custody, and

19  -- I'm sorry, Your Honor.

20         THE COURT:  They would otherwise not be USPLabs' --

21  related to USPLabs.

22         MR. RUNKLE:  Right.  And I think that that's inherent

23  in the possession, custody, and control cases that hold that

24  the entity's legal right to access the documents is what's

25  controlling.

```
 1              THE COURT:  And so is it your position that by virtue

 2    of them -- because everybody acknowledges that they are the

 3    principals of USPLabs -- that by virtue of them using USPLabs'

 4    equipment, computer equipment to have, for example, to utilize

 5    in some other businesses not related to USPLabs, then USPLabs

 6    necessarily has care, custody, and control of that?

 7              MR. RUNKLE:  I -- I --

 8              THE COURT:  I mean, in other words, they can't share

 9    offices and -- or computers, more to the point, with some other

10    entities they might be involved with?

11              MR. RUNKLE:  They could, but --

12              THE COURT:  And so what does that mean, though?  What

13    does that mean?

14              MR. RUNKLE:  Well, that means that it's a -- it

15    depends on the Court's construction of possession, custody, and

16    control.  So I could theorize a situation where you would be

17    able to share equipment possibly, but the USPLabs wouldn't have

18    possession of it.  But when you're using, you know, ceo@usplabs

19    to send emails about another company, you are exposing that

20    information to the corporation.

21              THE COURT:  Well, but then that's USPLabs'

22    involvement.

23              MR. RUNKLE:  That's exactly correct, yes.

24              THE COURT:  Right.  So then the -- or a principal's

25    part is what's the issue.
```

1          MR. RUNKLE:  Right.  But I don't believe that it -- I

2     think that it disappears on closer inspection.  Yes.  I think

3     that disappears upon closer inspection, when you actually take

4     an example like I just gave.

5        So if the email is between Jacob Geissler and John Doyle's

6     personal email accounts, it's theoretically not in the

7     possession, custody, and control of USPLabs.  If they send an

8     email about some other entity that they happen to be investors

9     in to their USPLabs email accounts, then it is in the

10     possession, custody, and control of USPLabs.  And that's the

11     distinction.  I think that distinction is well, you know,

12     understood in the case law, that possession, custody, and

13     control, if you were keeping it --

14          THE COURT:  Well, I'm not talking about whether they

15     possess it.  We wouldn't be here if they didn't possess it.

16     I'm talking about whether or not they have a claim of privilege

17     to it because it doesn't relate to USPLabs.  And does the mere

18     fact that it's on the USPLabs server make it any less so, if

19     it's not related to any business of USPLabs, if they're using

20     it for other businesses, too?

21          MR. RUNKLE:  Our position would be that if it's truly

22     on the USPLabs server, then it is in the possession of USPLabs.

23          THE COURT:  What do you base that on, though, is what

24     I'm asking.

25          MR. RUNKLE:  Well, that's the possession, custody, and

 1   control cases.

 2          THE COURT:  Well, that's not the issue.  I mean, they

 3   have possession of it.  I mean, you go into the -- you know,

 4   you go into the -- your response to their waiver thing is that,

 5   first of all, the subpoena is to USPLabs for USPLabs'

 6   documents.  But the subpoena is not just to USPLabs for

 7   USPLabs' documents, is the Defense's point.  You're asking also

 8   for information from the principals --

 9          MR. RUNKLE:  That's correct, to the extent --

10          THE COURT:  -- that doesn't relate to USPLabs.  It

11   just happens to be there.

12          MR. RUNKLE:  Correct.  And that's in the possession --

13   our position is that that's in the possession of USPLabs.

14          THE COURT:  Okay.  That's two different things.

15          MR. RUNKLE:  Okay.

16          THE COURT:  Okay.  I'm not talking about, okay, you

17   blanketly can ask USPLabs for everything USPLabs possesses,

18   whether it's related to USPLabs or not.

19          MR. RUNKLE:  Okay.

20          THE COURT:  I mean, they can share this, can't they?

21   Can't they share this computer?

22          MR. RUNKLE:  Yes, they can.  And they do.

23          THE COURT:  So if they share it, then, you know, I'm

24   just trying to see, because it's not like it's a search warrant

25   and, you know, I've left it out there.  And that's what I think

1    he was talking about when he talked about not Fourth Amendment

2    rights.

3              MR. RUNKLE:  Uh-huh.  Oh, I understand that

4    completely.  But to the extent that the business is run through

5    USPLabs' documents -- let me give another concrete example.  So

6    the PES entity was -- all of its accounting was done by

7    USPLabs' controller, Lonnie Clark.  And so these documents are

8    absolutely USPLabs' documents.  They are USPLabs' documents

9    created by USPLabs --

10             THE COURT:  But then that talks about USPLabs -- then

11   the portion of the request that requires USPLabs would cover

12   that.

13             MR. RUNKLE:  Right.  Except you just heard Mr. Linehan

14   make what I would consider an absolutely incorrect factual

15   representation, that USPLabs had nothing to do with PES, which

16   is categorically false.  And so if their position is that

17   USPLabs had nothing to do with this company, therefore there

18   are no USPLabs documents, that therefore the business is

19   completely separate from the principals, then they have to

20   produce no documents, and that absolutely makes no sense,

21   either.

22             THE COURT:  Well, it definitely doesn't based on

23   examples you've said.

24             MR. RUNKLE:  Right.  And I could --

25             THE COURT:  And I don't think -- I don't know.  I'll

1   have to ask him if he's contending that, under those examples

2   that you give, that they shouldn't have to produce those

3   documents.

4        MR. RUNKLE:  Well, I could give many more.  And I

5   wanted to -- I'll go back to the first point, which is that

6   this is a pretextual subpoena.  It absolutely is not.  I will

7   again lift the veil.  We've been doing this for a long time and

8   so I -- we have given them, I think, a fulsome discussion of

9   what is being investigated and I think they can understand it

10  from the subpoenas.

11       What's being investigated, and it's absolutely post-

12  indictment conduct, because, among many, many other reasons,

13  when the indictment happened, national supplement retailers

14  wanted nothing to do with the Defendants and their products and

15  got rid of the products, but nobody bothered to tell those

16  national supplement retailers that these Defendants had created

17  a separate company that they conspired to keep their names out

18  of so that they -- for this exact kind of circumstance, when

19  something happened with USPLabs, they would have some other

20  income source that nobody knew about and that they could

21  continue to draw income from.  That's what happened.

22       And so they were trying to not let anyone else know that

23  USPLabs was actually behind this company.  And that's why the

24  subpoena language covers -- I believe the subpoena language

25  covers that conduct.  And that's where we are, and that's why

1    the subpoena is what it is.

2        And they, in fact, you know, in terms of people that are

3    not in the indictment that the grand jury subpoena covers,

4    there's PES itself, there's Muscle Management, there's, you

5    know, the attorneys at Brewer Lormand, who I think have a lot

6    of questions to answer about what they were doing, you know,

7    keeping these peoples' names out of a company that, you know,

8    and then they could go around and say that it's somebody else's

9    company, it's not theirs.  That's the conduct that's being

10   investigated.

11       And Muscle Management was absolutely run through USPLabs'

12   systems with USPLabs' personnel, and it had -- while it

13   ostensibly had other functions, it was part of the USPLabs

14   entity.  It's listed on vast numbers of lists of USPLabs'

15   entities that we seized during the search warrant.

16       So to say that there's no connection between them and so

17   they don't have to actually produce anything with the subpoena

18   is just incorrect.

19       To the extent that there are what they claim to be personal

20   documents that were not -- that are in -- on USPLabs' servers,

21   the Government's position is that those are USPLabs' documents,

22   for the reasons that I've said.

23                THE COURT:  Okay.

24                MR. RUNKLE:  Thank you.

25                MR. LINEHAN:  Your Honor, may I?

1        THE COURT:  Yes.

2        MR. LINEHAN:  I lost my glasses.  Sorry.  A few quick

3   points.  I think Mr. Runkle has mischaracterized what I said.

4   What I said was that USPLabs was not corporately affiliated

5   with any of these entities.  That doesn't mean that there

6   aren't any -- any business that's being done between USPLabs

7   and any of these entities.  And on this Fifth Amendment issue,

8   I don't think we would consider those documents to be part of

9   my concern about the Fifth Amendment implication here.  What I

10  am concerned about is that the subpoena requires the production

11  of the individuals' personal business documents.

12     Maybe I -- let me try an extreme example of this.  Let's

13  take a sole proprietorship that asks for business documents

14  relating to Business A, plus let me -- plus I want all the

15  communications about -- between you and your wife.  Okay.  If

16  he does those emails, this is a single proprietor, works from a

17  single email address and also sends personal things out, I

18  don't think the law requires the production of those personal

19  emails.  I think the case law is pretty clear that this applies

20  to business documents.  And when someone produces -- and the

21  collective entity exception is that the custodian, when in its

22  representative capacity and producing documents for the

23  business for which they represent, that they represent, that's

24  the exception.  The exception is not that custodian producing

25  documents that are personal to him.

```
 1            THE COURT:  Okay.  What I've decided is that I'm going

 2   to have to look at them.  So I'm going to deny the motion to

 3   quash and I'm going to order the production within -- I'll give

 4   you -- how many documents, do you think?

 5            MR. GIBSON:  Your Honor, may I?  This is Mike Gibson

 6   for the record.

 7            THE COURT:  Yes.

 8            MR. GIBSON:  And I represent Mr. Geissler.

 9            THE COURT:  Yes.

10            MR. GIBSON:  And I've kind of been tasked with this.

11            THE COURT:  Okay.  Okay.

12            MR. GIBSON:  I was going to approach the --

13            THE COURT:  Okay.  Okay.  Go ahead.  I'm sorry.

14            MR. GIBSON:  No, no.

15            THE COURT:  I didn't realize you all were tag-teaming.

16   Go right ahead.

17            MR. GIBSON:  I was not trying to be the one to be able

18   to answer that question.

19            THE COURT:  Yes.

20            MR. GIBSON:  We would ask for, if the Court is going

21   to order production, and especially hopefully for Court review,

22   --

23            THE COURT:  Uh-huh.

24            MR. GIBSON:  -- I would like -- the original subpoena

25   asked for 45 days.
```

1          THE COURT:  Uh-huh.

2          MR. GIBSON:  I would like to ask for 45 days.

3          THE COURT:  Okay.

4          MR. GIBSON:  And be able to produce it as whatever you

5    order.

6          THE COURT:  Okay.

7          MR. GIBSON:  And I was going to ask for, and I think

8    that's where the Court is going, for more clarity on Paragraph

9    3 so that I can determine -- because, for example, if Mr.

10   Geissler's personal checkbook is sitting up there in USPLabs'

11   facility, --

12         THE COURT:  Well, what would that have to do with his

13   relationship, though, with another entity?

14         MR. GIBSON:  It wouldn't have any and so I wouldn't

15   respond or produce it.

16         THE COURT:  So you wouldn't need to produce it.

17         MR. GIBSON:  But I want to, because it's so vague and

18   a little broad, I don't want to transgress a court order by

19   doing it.

20         THE COURT:  Uh-huh.  Okay.

21         MR. GIBSON:  So maybe that's the point, if we can

22   clarify it or the Court can review it.

23         THE COURT:  I don't think you or I would -- or even

24   they would suggest that that would fit under the request.  So

25   you're going to have to tell me more about what you think and

1   why it's not clear.

2          MR. GIBSON:  Well, if he's running another business,

3   for example.

4          THE COURT:  Well, yes, that's the stuff they do want.

5          MR. GIBSON:  Well, well, but it's his business and

6   he's selling --

7          THE COURT:  Well, that's the question.

8          MR. GIBSON:  -- widgets out the door --

9          THE COURT:  Well, that's the question, right?

10          MR. GIBSON:  -- and it's Geissler Widget Company.

11          THE COURT:  That's the question, right?

12          MR. GIBSON:  The question is, is that covered by this

13   subpoena?  Because he worked at USPLabs and has his business

14   office there that he does other things in, and that's the

15   clarity --

16          THE COURT:  Well, that's what we're going about, but

17   I'm denying the motion to quash and I'm going to order the

18   production within 45 days, except that any of the documents

19   that you believe are responsive to the request, however, you

20   have some question of whether they come within this -- let's

21   just call it personal --

22          MR. GIBSON:  Yes, ma'am.

23          THE COURT:  -- exception as has been argued here, I'm

24   going to require that those in 45 days be produced for *in*

25   *camera* inspection to me.

1          MR. GIBSON:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. GIBSON:  Thank you very much.

4          THE COURT:  Okay.  So I'm going to task you with an

5   order that says that.

6      I'm going to task you with an order that denies the motion

7   for protective order based on what was said here today.

8      I'm going to task USPLabs with an order denying the

9   Government's 143 cross-motion -- and, of course, the record is

10  not saying that, but I'm talking to USPLabs -- for the reasons

11  stated here.

12     And let's see.  What was the other one?  And then I'm going

13  to task -- did I say the *Brady* motion yet?

14         MR. RUNKLE:  Yes.  No.

15         THE COURT:  Okay.  I'm going to task the Government

16  with an order that denies the *Brady* motion for the reasons

17  stated here today.

18         MR. RUNKLE:  Yes, Your Honor.

19         THE COURT:  Okay.  To the extent I said it's denied.

20  You know what I mean.  Okay.

21         MR. WEILAND:  *Brady* motion, Your Honor?

22         THE COURT:  Sir?

23         MR. WEILAND:  Do you mean with the exception of what

24  you ordered?

25         THE COURT:  With the exception.  I said with the

1    exceptions that I've stated here today.  I'm just trying to get

2    something in writing, and I'm delegating because Judge Boyle

3    says I should do more of that, to you to memorialize what has

4    happened here today.

5        Okay.  Thank you, gentlemen.

6            MR. RUNKLE:  Thank you, Judge.

7            MR. WEILAND:  Thank you very much, Your Honor.

8            MR. LINEHAN:  Thank you for your time.

9            THE COURT:  We're adjourned.

10            THE CLERK:  All rise.

11        (Proceedings concluded at 12:29 p.m.)

12                            --oOo--

13

14

15

16

17

18

19

20

21                        CERTIFICATE

22        I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
23    entitled matter.

24    **/s/ Kathy Rehling**                        **07/27/2017**
     _____        _____

25
     Kathy Rehling, CETD-444                            Date
     Certified Electronic Court Transcriber

1

2                                    INDEX

3    PROCEEDINGS                                                    3

4    WITNESSES

5    -none-

6    EXHIBITS

7    -none-

8    RULINGS

9    Motion for Disclosure of Specific Impeachment and           28
     Exculpatory Information filed by Matthew Hebert [130] -
10   *Granted as specified*

11   Motion on Discovery as to USPLabs LLC, Jacobo Geissler,     84
     Jonathan Doyle, Matthew Hebert, Kenneth Miles, SK
12   Laboratories Inc, Sitesh Patel, and Cyril Willson filed
     by USA [143] - *Denied*
13

14   Motion for Protective Order filed by Jonathan Doyle [210] - 84
     *Denied*
15

16   Sealed Motion to Quash the Grand Jury Subpoena as to        110
     USPLabs LLC, Jacobo Geissler, Jonathan Doyle, Matthew
17   Hebert filed by Defendant [176] - *Denied*

18   END OF PROCEEDINGS                                          114

19   INDEX                                                       115

20

21

22

23

24

25